**UNITED STATES of America, Appellee,**

v.

**Jerry Ralph ANGELL, Appellant.**

**UNITED STATES of America, Appellee,**

v.

**Arlen Floyd ANGELL, Appellant.**

**Nos. 92–2872, 92–2897.**

United States Court of Appeals,
Eighth Circuit.

Submitted Feb. 18, 1993.

Decided Dec. 13, 1993.

Rehearing and Suggestion for Rehearing En Banc Denied in No. 92–2897 Feb. 10, 1994.*

Rehearing and Suggestion for Rehearing En Banc Denied in No. 92–2872 Feb. 24, 1994.**

---

* Richard S. Arnold, Chief Judge, McMillian and Morris Sheppard Arnold, Circuit Judges, would grant the suggestion for rehearing en banc.

** Magill, Circuit Judge, took no part in the consideration or decision of this case.

Douglas Peine, St. Paul, MN, argued, for appellant in 92–2872.

Earl P. Gray, St. Paul, MN, argued, for appellant in 92–2897.

Margaret T. Burns, Minneapolis, MN, argued, for appellee.

Before BOWMAN, WOLLMAN, and HANSEN, Circuit Judges.

WOLLMAN, Circuit Judge.

Arlen F. Angell and Jerry R. Angell were convicted of manufacturing marijuana, in violation of 21 U.S.C. § 841(a)(1), and conspiring to manufacture marijuana, in violation of 21 U.S.C. § 846. Additionally, Arlen Angell was convicted of using a firearm during and in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1). The Angells appeal from these convictions, and the government cross-appeals the Angells' sentences. We affirm the convictions, vacate the sentences, and remand for resentencing.

## I.

In the early morning hours of May 17, 1991, Sergeant Joseph Loftus of the Olmstead County, Minnesota, Sheriff's Department was notified that an unattended van was parked in the middle of Olmstead County Road 20 immediately south of where County Road 20 intersects Minnesota Highway 30. Loftus arrived at the van's location at approximately 1:50 a.m. and radioed in the van's license plate number for a registration check.

While waiting for the information, Loftus observed a car approaching from the north on County Road 20. The car stopped at the intersection's stop sign, within a few feet of Loftus's patrol car. Loftus shined his flashlight on the car and its two male occupants. While still in his patrol car, Loftus asked the two men who they were and where they were going. The driver of the car responded that he was Jerry Angell and that they were on their way home, which was only a few miles away. Loftus asked Jerry Angell if he had been drinking; Angell answered no. According to Sergeant Loftus, he told the car's occupants: "Stay there, I want to talk to you." According to Jerry Angell, Loftus said "Hold it right there. I'm going to get out and come talk to you." According to Arlen Angell, Loftus said "Hold it right there, I want to talk to you guys."

Loftus then walked over to the Angells' automobile, shining his light into the vehicle to observe its interior and its occupants. He asked the driver for a driver's license and the passenger for identification. Jerry Angell

produced a Minnesota driver's license bearing his name; the passenger said that he had no identification but indicated that he was Arlen Angell. As Loftus questioned the men, he observed in the car's back seat a pickaxe, which was covered with wet mud that had green grass embedded in it. Loftus also saw containers of plant fertilizer and plant-starter trays. Additionally, Loftus noticed that Arlen Angell was sweating and covered with mud. When Loftus asked the men why Arlen Angell was so muddy, they explained that he had gotten muddy while helping a stranded motorist near the airport. Loftus did not believe their explanation because the roads in the vicinity of the airport are paved.

Loftus ran a warrant check on the men and found that there was an outstanding Hennepin County arrest warrant for Jerry Angell. Loftus then radioed for back-up officers and arrested Jerry Angell. Loftus searched Jerry Angell and found a small plastic bag of human hair in his pocket. When the back-up officers arrived, they searched the Angells' car. In addition to the items that Loftus had already observed, the officers found two police scanners in the car. Because carrying a scanner in a vehicle is illegal, the officers seized the scanners. After the officers had photographed Arlen Angell with the items initially observed by Loftus, they released him, along with the items and the car. Jerry Angell was taken to the Olmstead County Jail.

From their observations, the officers believed that the Angells had marijuana planted somewhere in the vicinity. Three officers drove north on County Road 20 to see if they could find the Angells' marijuana growing site. Approximately one and one-half miles from the intersection, they discovered fresh tire tracks in the mud near an abandoned farm. The officers followed the tracks to a field, located several hundred yards from the road, where they found sixteen freshly planted marijuana plants.

Following the discovery of the marijuana plants, several officers went to the Angell residence. Arlen Angell answered the door, whereupon the officers asked if they could search the house. Arlen replied that they could not enter the house without a search warrant.

Based on the information that they had acquired that morning, the officers obtained a search warrant for the Angell home. At approximately 9:30 a.m. that same morning, the officers executed the warrant. They found evidence of a hastily disassembled marijuana growing operation in the house. The officers found four large plastic bags containing numerous marijuana plants, plastic growing trays, and potting soil. They found residue of what appeared to be recently incinerated plants in a basement stove and marijuana leaves still swirling in the toilet bowl. The officers also discovered a hydrofarm indoor growing system, growing lights, plant fertilizer, scales, and a collection of how-to-grow-marijuana books. Additionally, they found two loaded semi-automatic handguns and several long guns.

On September 5, 1991, several law enforcement officers spoke with Arlen Angell at the Angell residence. Angell asked them questions about his case and answered questions concerning his marijuana growing operation and the growing of marijuana in general.

A federal grand jury subsequently indicted the Angells. Following a jury trial, both Angells were convicted of manufacturing marijuana and conspiring to manufacture marijuana. Arlen Angell was also convicted of using a firearm during a drug trafficking offense. The district court sentenced Arlen Angell to twenty-seven months' imprisonment on the marijuana charges and to sixty consecutive months' imprisonment on the firearms charge. The district court sentenced Jerry Angell to thirty-three months' imprisonment, 794 F.Supp. 874.

## II.

We first consider the Angells' argument that the district court erred in denying their separate pre-trial motions to suppress all evidence derived from their initial encounter with Sergeant Loftus. In their motions, the Angells argued that Loftus's initial stop constituted an unconstitutional seizure and that therefore all evidence obtained as a result thereof should be suppressed. Following a

hearing, a United States magistrate judge found that Loftus's initial encounter with the Angells did not constitute a seizure. The magistrate judge further found that once Loftus observed the Angells and the interior of their car, he developed a reasonable, articulable suspicion of criminal activity that justified his detaining the Angells for investigatory purposes. After reviewing the record de novo, the district court adopted the magistrate judge's report and recommendation and denied the motions to suppress.

■ The determination whether a seizure occurred is a question of law that we review de novo. *United States v. McKines,* 933 F.2d 1412, 1426 (8th Cir.) (en banc), *cert. denied,* —— U.S. ——, 112 S.Ct. 593, 116 L.Ed.2d 617 (1991).

■ "Obviously, not all personal intercourse between policemen and citizens involves 'seizures' of persons." *Terry v. Ohio,* 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 1879 n. 16, 20 L.Ed.2d 889 (1968). No seizure occurs when a police officer merely questions an individual or asks to examine an individual's identification—so long as the officer does not convey a message that compliance with his request is required. *Florida v. Bostick,* —— U.S. ——, ——, 111 S.Ct. 2382, 2386, 115 L.Ed.2d 389 (1991). If "a reasonable person would feel free 'to disregard the police and go about his business,'" the encounter is consensual and Fourth Amendment scrutiny is not triggered. *Id.* (quoting *California v. Hodari D.,* 499 U.S. 621, 626–28, 111 S.Ct. 1547, 1551, 113 L.Ed.2d 690 (1991)). In short, to determine whether a particular police encounter constitutes a seizure, we consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that he was not free to decline the officer's request or otherwise terminate the encounter. *Id.* —— U.S. at ——, 111 S.Ct. at 2389. "The test is necessarily imprecise, because it is designed to assess the coercive effect of police conduct, taken as a whole, rather than to focus on particular details of that conduct in isolation." *Michigan v. Chesternut,* 486 U.S. 567, 573, 108 S.Ct. 1975, 1979, 100 L.Ed.2d 565 (1988).

Loftus's initial questioning of the Angells concerning who they were and where they were going did not constitute a seizure. The Angells argue, however, that the encounter became a seizure when Loftus told them: "Stay there, I want to talk to you." They contend that a reasonable person would not have felt free to disregard Loftus's request.

We find the Angells' argument unpersuasive. As the Supreme Court has stated, circumstances that might indicate a seizure "would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *United States v. Mendenhall,* 446 U.S. 544, 555, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980). Moreover, what constitutes a seizure "will vary, not only with the particular police conduct at issue, but also with the setting in which the conduct occurs." *Chesternut,* 486 U.S. at 573, 108 S.Ct. at 1979. In this case, the events occurred on a rural public road in the presence of only one officer. Loftus did not turn on his patrol car lights, did not block the pathway of the Angell's car, did not draw a weapon, and did not physically touch the Angells. Granted, Loftus's statement (whether "Stay there" or "Hold it right there") clearly indicated that he wanted the Angells to remain where they were so that he could talk with them. Nevertheless, given the lateness of the hour, the remoteness of the scene, and the unexplained presence of the unoccupied van, neither Loftus's language nor his conduct constituted anything other than what a reasonable person would have construed as a consensual encounter between a law enforcement officer and a member of the public. Had Loftus couched his request in more indirect language, such as, say, "Could I talk to you guys a minute," or "Would you hold up a minute, please," there would be no question about the consensual nature of the subsequent conversation between Loftus and the Angells. In the light of the totality of the circumstances, we conclude that Loftus's actual language, although perhaps somewhat more peremptory than precatory in tone, did not convert what would clearly have been a consensual encounter

into a seizure within the meaning of the Fourth Amendment. *See United States v. Jones*, 990 F.2d 405, 408 (8th Cir.), *cert. denied*, — U.S. ——, 114 S.Ct. 350, 126 L.Ed.2d 314 (1993). There is no evidence that Loftus approached the Angell's automobile with other than the intention of conducting a routine, good faith inquiry into the identity and whereabouts of the owner/driver of the unattended van. Indeed, Loftus would probably have been derelict in his duties had he not made such an inquiry. The locution of his desire to conduct this inquiry must be read in the context of the events that gave rise to it, and when so viewed does not run afoul of the Fourth Amendment. Accordingly, we hold that the district court did not err in denying the motion to suppress.

### III.

■ Paul Bostrack, who at the time was a deputy sheriff in an adjoining county, participated in the search of the Angells' automobile and home. His affidavit submitted in support of the application for a warrant to search the Angells' home stated in part that he "knows the contents of this application and supporting affidavit, and the statements herein are true of his own knowledge." Attached to the affidavit was a copy of Bostrack's report, together with copies of the reports prepared by Loftus and Deputy Sheriff Tim Freder. Bostrack testified at the suppression hearing that although he had discussed the contents of their respective reports with Loftus and Freder, he had not actually read the written reports that were made a part of the warrant application.

The Angells contend that because Bostrack had not read Loftus's and Freder's reports, the above-quoted portion of Bostrack's affidavit contained a materially false statement that should have been deleted from the affidavit pursuant to *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), thus rendering the search warrant invalid.

We agree with the government that there is no merit to this contention. Bostrack's testimony was that he had discussed the reports with his fellow officers and that he was confident that he knew the contents of the reports. Thus, the challenged statement in his affidavit contained no falsehood, to say nothing of a material falsehood, and the district court did not err in refusing to rule the search warrant invalid.

### IV.

■ Arlen Angell contends that the evidence was insufficient to support the conviction on the section 924(c)(1) charge. He argues that there is no evidence that the two handguns found in zippered cases near the front door of his house were used by him within the meaning of section 924(c)(1). We do not agree. The house contained more than 100 marijuana plants, along with growing equipment, scales, and packaging materials. There was no question, then, but that the house was the site of a drug trafficking crime. Our cases have consistently held that the government need only establish that a firearm was present and available for use to support a conviction under section 924(c)(1). *See, e.g., United States v. Horne*, 4 F.3d 579, 587 (8th Cir.1993); *United States v. Travis*, 993 F.2d 1316, 1321 (8th Cir.), *cert. denied*, — U.S. ——, 114 S.Ct. 229 *and* 245, 126 L.Ed.2d 184 (1993); *United States v. Deitz*, 991 F.2d 443, 447 (8th Cir.1993); *United States v. Jones*, 990 F.2d 1047, 1049 (8th Cir.), *petition for cert. filed* (U.S. June 9, 1993) (No. 93–5904). The government met that burden here. One of the handguns had a round in the chamber and two in the magazine; the other was fully loaded and encased with two six-round speed loaders. The handguns were ready at hand near the front door of the Angells' house. In addition, three semi-automatic long guns and accompanying ammunition were found in the front room of the residence. One of these was an assault-type weapon with a collapsible stock. If not the armed fortress described in *United States v. Matra*, 841 F.2d 837, 841–43 (8th Cir.1988), the Angells' house was a well-armed drug trafficking site, and the jury was well within its rights in finding that Arlen Angell had used the handguns during and in relation to a drug trafficking offense.

We have considered Arlen Angell's contention that the district court erred in admitting evidence regarding the other weapons found in the house, and we conclude that it is without merit.

## V.

The government cross-appeals from the sentences imposed upon both defendants, contending that the district court erred in applying a one-plant one-pound equation to the marijuana plants seized at the drug-growing site rather than the one-plant one-kilogram equation established by section 2D1.1(c) of the Sentencing Guidelines.

Called as a witness on behalf of the government at trial, a special agent of the Minnesota Bureau of Criminal Investigation testified as follows regarding the weight of marijuana that can be derived from one plant:

If your marijuana plant is allowed to mature to full growth, our experience is it averages about one pound per plant, although some plants if they are smaller will get a half pound or 10 ounces of processed marijuana, usable, salable marijuana, and some plants, the largest ones that sometimes grow outdoors or are of a different variety, have seen [sic] two pounds of processed, usable, salable marijuana.

Section 2D1.1(c) of the Sentencing Guidelines provides in part that:

In the case of an offense involving marihuana plants, if the offense involved (A) 50 or more marihuana plants, treat each plant as equivalent to 1 KG of marihuana; (B) fewer than 50 marihuana plants, treat each plant as equivalent to 100 G of marihuana. *Provided,* however, that if the actual weight of the marihuana is greater, use the actual weight of the marihuana.

In response to the government's argument concerning the weight equivalency provision of the Guidelines, the district court stated:

I, first of all, think that your comment with respect to the 100–plant issue is the applicable comment, but we also get into weight factors. And what happened in this case is that the Government's witness clearly and repeatedly testified that from a mature plant comes one pound. I didn't bring a Guideline book in with me. But if I did, it clearly says that from a mature plant is a kilo.

It's the Court's view that when you have somebody abstractly in Washington that I have never met, heard of or thought of

comment on something versus a live witness on the witness stand testifying as a knowledgeable person in the subject, knowing the conditions in Minnesota—I don't know what they are in Washington, D.C., but this person knows the conditions in Minnesota. If that person testifies to one pound from a mature plant, then I believe the appropriate thing for this Court to find is one pound from the plant, not one kilogram, as stated in the Guideline book.

After finding that the Angells were chargeable with having produced eighty-six marijuana plants, the district court determined the weight equivalency of those plants as follows:

The Court next must convert the number of identifiable plants into a weight equivalency. Although the Guidelines indicate an equivalency of one kilogram per plant, testimony in this case, presented by the Government expert, calculated that each plant would produce one pound, 453.6 grams, of marijuana. The Court believes it most appropriate to rely on the trial testimony in this case. Using the one pound, 453.6 grams, per plant ratio, multiplied by 86 plants, results in 39,110 grams or 39 kilograms of marijuana.

With all due respect for the methodology it employed, we conclude that the district court erred in not applying the weight equivalency provision of section 2D1.1(c) set forth above.

We have held that section 2D1.1(c) does not violate equal protection or due process guarantees and that the ratio established by that section is not irrational. *United States v. Coones,* 982 F.2d 290, 292 (8th Cir.1992); *United States v. Johnston,* 973 F.2d 611, 613 (8th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1019, 122 L.Ed.2d 165 (1993); *United States v. Smith,* 961 F.2d 1389, 1390 (8th Cir.1992).[1] For similar holdings, *see, e.g., United States v. Taylor,* 985 F.2d 3, 9 (1st Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 2426, 124 L.Ed.2d 647 (1993); *United States v. Underwood,* 970 F.2d 1336, 1339–40 (4th Cir.1992); *United States v. Holmes,* 961 F.2d 599, 601–03 (6th Cir.), *cert. denied,* 113 S.Ct. 232 (1992); *United States v. Haynes,* 969 F.2d 569, 570–71 (7th Cir.1992); *United*

---

1. We are not unaware of the recently-extended    invitation to challenge these holdings expressed

**812**

*States v. Occhipinti,* 998 F.2d 791, 802 (10th Cir.1993).

In *United States v. Johnston,* we noted that in light of the validity of the weight ratio provision, expert testimony about a plant's yield of marketable marijuana would be irrelevant. 973 F.2d at 613 n. 3. *See also, United States v. Holmes,* 961 F.2d at 599 (rejecting empirical evidence regarding yield of marijuana plant). Accordingly, notwithstanding the government's proffer of expert testimony regarding the average yield of a marijuana plant (and the district court's understandable desire to hold the government to the proof it offered), we hold that the district court should have applied section 2D1.1(c)'s weight-equivalency ratio and should have sentenced the Angells on the basis of the base offense levels resulting from the application of that provision of the Guidelines.

The convictions are affirmed. The sentences are vacated, and the cases are remanded to the district court for resentencing.

by another panel of this court. *See United States v. Marshall,* 998 F.2d 634, 635 (8th Cir.1993).

To the extent that the present appeal presents such a challenge, we reject it.