# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 01-3941

_____

United States of America,          *
                                   *
          Appellee,                *
                                   *
     v.                            *
                                   *
Humberto Santos-Garcia,            *
                                   *
          Appellant.               *

_____                          Appeals from the United States
                                     District Court for the
No. 02-1583                          District of Nebraska

_____

United States of America,          *
                                   *
          Appellee,                *
                                   *
     v.                            *
                                   *
Mario Sanchez-Nunez,               *
                                   *
          Appellant.               *

                        _____

          Submitted:   October 7, 2002

              Filed:   December 27, 2002

                        _____

_____

Before McMILLIAN, LAY and RILEY, Circuit Judges.
_____

McMILLIAN, Circuit Judge.

Humberto Santos-Garcia (Santos) and Mario Sanchez-Nunez (Sanchez) appeal from judgments entered in the district court[1] following their convictions arising from a conspiracy to distribute methamphetamine. Santos challenges the district court's denial of his suppression motion. Sanchez challenges the district court's denial of his motion to dismiss the indictment, denial of motion for judgment of acquittal or new trial, and imposition of his sentence. We affirm the judgments.

## BACKGROUND

On September 2, 2000, Nebraska State Trooper Kenneth Ayers stopped a 1991 Dodge Dynasty with Nevada license plates for speeding. Santos was the driver of the car and Roberto Arreguin-Rivera (Arreguin) was the passenger. Ayers asked them for driver's licenses and vehicle registration. Santos produced a Nevada driver's license and registration for the car; Arreguin produced a California driver's license. Ayers, who noticed a strong unidentifiable odor coming from the car, asked Santos to step out of the Dodge and to stand at the rear of the car, which he did. Ayers asked Santos several questions, including his relationship with Arreguin and the purpose of trip. Santos said they were going to Omaha to see a friend and to stay a few days to look for work. Ayers then questioned Arreguin, who was still in the car. Arreguin said they were going to Omaha to visit a friend and thought they would stay a week. Ayers confirmed that the car belonged to Santos and that he had no criminal background and decided to issue a written warning.

_____

[1]The Honorable Richard G. Kopf, United States District Judge for the District of Nebraska.

After returning Santos's license and registration and explaining the warning, Ayers asked Santos if drugs were in the car. Santos said no, and Ayers asked Santos for permission to search the car. Santos consented and signed a consent to search form. Ayers then approached Arreguin, who was seated in the Dodge, asking if he had luggage and, if he did, would he consent to a search of it. Arreguin said he had luggage, but, apparently because of poor English skills, did not understand Ayers's request to search his luggage. After Santos translated Ayers's request, Arreguin consented to a search. Ayers then asked Santos to open the trunk of the Dodge. Santos retrieved the keys and opened the trunk. Ayers discovered 19 packages of methamphetamine, weighing a total of about 22 pounds, located in rocker panels of the car.

Ayers arrested Santos and Arreguin and took them to the state patrol office in Lexington, Nebraska. After obtaining a Miranda waiver, around 10 p.m., Investigator Gary Eng questioned Santos. Initially, Santos denied knowing that methamphetamine was in the car, telling Eng that he was being paid $1500 to drive the Dodge from Reno, Nevada, to Omaha, Nebraska, for an individual named Mario. Eng told Santos that his story did not make sense and asked if Santos had children. Santos, who was twenty years old, said yes. Eng told Santos that, given the amount of methamphetamine, under the federal sentencing guidelines, his sentence would be about fifteen years and that his children would be driving by the time he was released from prison. Santos then admitted he knew methamphetamine was in the car, explaining Mario had directed them to call him after they checked into a motel near a highway and he would then pick up the methamphetamine. Eng also told Santos that if he cooperated, his sentence might be reduced, but explained to cooperate meant he would have to admit his knowledge of the methamphetamine and participate in a controlled delivery of the drugs to Mario in Omaha. Santos agreed to cooperate.

At the end of Eng's interrogation of Santos, Investigator Michael Dowling came into the room and confirmed that Santos had been advised of his Miranda rights.

Dowling then drove Santos to Grand Island, Nebraska, for a polygraph examination. At the beginning of the seventy-mile trip, Dowling reminded Santos of his Miranda rights. Santos told Dowling that he understood his rights and had waived them, again confessing to transporting the methamphetamine from Reno, Nevada, to Omaha, Nebraska, for Mario.

Dowling and Santos arrived in Grand Island around 5:30 a.m. Before the polygraph examination, Investigator Vincent Hernandez advised Santos of his Miranda rights and Santos signed a waiver and a polygraph release. Santos then made incriminating statements.

After the polygraph examination, Hernandez accompanied Santos to the state patrol office in Omaha to participate in the controlled delivery. Ayers drove the Dodge from the patrol office to a Motel 6 near a highway and placed a package of methamphetamine in a rocker panel of the car. Hernandez and other law enforcement officers accompanied Santos and Arreguin to the motel. At the motel, Santos placed a telephone call to a number, which had been found in Arreguin's wallet, and talked to Mario. Santos told Mario that he and Arreguin were staying at a Motel 6 near a highway. Mario wanted to talk to Arreguin, but Santos told him Arreguin would call him back. Arreguin called Mario and told him that they would put the keys to the Dodge in the visor on the driver's side. Shortly thereafter, a white Mustang pulled into the motel parking lot. Sanchez got out of the Mustang, opened the driver's side door of the Dodge, and took the keys from the visor. Sanchez then drove the Dodge to a trailer park, where he parked it. He left the Dodge and, without taking the package of methamphetamine, got into the white Mustang, which was waiting for him. As the Mustang was leaving the trailer park, officers stopped it and arrested Sanchez and two other men in the car.

Santos, Arreguin, and Sanchez were charged with conspiracy to distribute methamphetamine and with possession with the intent to distribute

methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), 846.[2]  Santos filed a suppression motion, which the district court granted in part and denied in part.  The district court denied the motion as to the methamphetamine, holding that Ayers had reasonable suspicion to search the Dodge.  In the alternative, the district court held that Santos had voluntarily consented to the search of the car.  The district court granted the motion as to Santos's confession to Eng, reasoning that it was involuntary because it was coerced by Eng's comment that Santos's children would be driving by the time he finished his sentence.  However, the district court denied the motion as to Santos's statements to Dowling and Hernandez, holding that the subsequent statements were sufficiently attenuated from the coercive conduct of Eng.

Santos then entered a guilty plea to an information charging him with misprision of a felony, in violation of 18 U.S.C. § 4, and was sentenced to time served.  Santos testified for the government at Sanchez's trial.  On redirect examination, Santos testified that while he was in jail, Sanchez offered to get him an attorney and help his family, if he took responsibility for the drugs.  Sanchez moved for a mistrial because the government had not disclosed Santos's testimony concerning the attempted bribe.  The district court granted the motion because of unfair surprise, but held that the government had not violated Fed. R. Crim. P. 16 or the Jencks Act.  Sanchez then filed a motion to dismiss the indictment on double jeopardy grounds, which the district court denied.  At the second trial, Santos again testified for the government, stating that Mario had paid him to transport the Dodge from Nevada to Omaha, Nebraska.  Santos also repeated his testimony that Sanchez had tried to bribe him to take responsibility for the methamphetamine.  The jury convicted Sanchez of possession with the intent to distribute methamphetamine and conspiracy. At sentencing, based on Santos's testimony concerning the attempted

---

[2]Arreguin pled guilty to the conspiracy charge and was sentenced to 97 months. His conviction and sentence were upheld on appeal. United States v. Arreguin-Rivera, No. 02-1087, 2002 WL 1610887 (8th Cir. July 23, 2002) (unpublished).

bribe, the district court imposed an obstruction-of-justice enhancement under U.S.S.G. § 3C1.1. After refusing Sanchez's requests for a role-in-the-offense reduction under U.S.S.G. § 3B1.2 and for a downward departure under § 5K2.0, the district court sentenced him to 235 months imprisonment.

**DISCUSSION**

**Santos**

Santos argues that the district court erred in denying his suppression motion. "We review the district court's conclusions of law regarding the denial of a motion to suppress de novo, and review its findings of fact for clear error." United States v. Booker, 269 F.3 930,931 (8th Cir. 2001).

We first address Santos's arguments concerning the search of the Dodge. Santos concedes that the stop of the car for speeding was lawful, and, incident to the stop, Ayers was entitled to conduct a reasonable investigation, including asking him to step out of the car and question him and Arreguin about the purpose of the trip. See United States v. White, 81 F.3d 775, 778 (8th Cir.), cert. denied, 519 U.S. 1011 (1996). However, Santos argues that during the investigation Ayers had not developed reasonable suspicion to search the car. We need not address this argument. "Even if [Ayers] had no suspicion that [Santos] was engaged in criminal activity, if the encounter after the completion of the traffic stop was consensual, then the Fourth Amendment would not prohibit Trooper [Ayers] from asking questions unrelated to the traffic stop, [and] from seeking consent to search the [car]." United States v. Jones, 269 F.3d 919, 925 (8th Cir. 2001).

Santos argues that, after the completion of the stop, his encounter with Ayers was not consensual, but was a seizure. We disagree. "Although there is no litmus test for determining" whether an encounter is consensual or constitutes a seizure,

"circumstances indicative of a seizure may include 'the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person . . . , or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.'" White, 81 F.3d at 779 (quoting United States v. Angell, 11 F.3d 806, 809 (8th Cir. 1993)). Contrary to his argument, Santos was "no longer seized within the meaning of the Fourth Amendment after [Ayers] returned [his] identification and issued a warning ticket." Id. Ayers did not display a weapon, and, as the district court found, "the tone of the entire exchange was cooperative." Id. "Moreover, at the time [Ayers] asked to search the vehicle [Santos] had everything he needed to lawfully proceed on his journey." Id.; see also United States v. Drayton, 122 S. Ct. 2105, 2112 (2002) (bus passengers were not seized when officers boarded bus where "[t]here was no application of force, no intimidating movement, no overwhelming show of force, no brandishing of weapons, no blocking of exits, no threat, no command, not even an authoritative tone of voice").

Also, contrary to Santos's argument, "[t]he fact that [Ayers] had not explicitly said they could leave does not establish that the conversation . . . was not consensual." United States v. Morgan, 270 F.3d 625, 630 (8th Cir. 2001), cert. denied, 123 S. Ct. 192 (2002). Indeed, the Supreme Court has repeatedly "rejected in specific terms the suggestion that police officers must always inform citizens of their right to refuse when seeking permission to conduct a warrantless consent search." Drayton, 122 S. Ct. at 2113 (citing Ohio v. Robinette, 519 U.S. 33, 39-40 (1996); Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973)). In Drayton, the Court explained that "[i]n a society based on law, the concept of agreement and consent should be given a weight and dignity of its own." Id. at 2114. "Although [Ayers] did not inform [Santos] of [his] right to refuse the search, [Ayers] did request permission to search, and the totality of the circumstances indicates [Santos's] consent was voluntary, so the search[] w[as] reasonable." Id.

The district court also did not err in refusing to suppress Santos's statements to Dowling and Hernandez. As previously noted, the district court suppressed Santos's confession to Eng, but refused to suppress his subsequent statements, holding that they were sufficiently attenuated from the taint of Eng's coercive conduct. Santos argues that the district court erred in holding that the statements were sufficiently attenuated because there was no "break in the stream of events" from his confession to Eng to his subsequent statements.

We need not address Santos's "break-in-the-stream" argument. "It is a well-settled principle that we may affirm a district court's judgment on any basis supported by the record." United States v. Pierson, 219 F.3d 803, 807 (8th Cir. 2000). The district court held that Santos's confession to Eng was involuntary because it was coerced by Eng's comment that Santos's children would be driving by the time he was released from prison. However, we believe that Eng's comment was "not so coercive as to deprive [Santos] of [his] ability to make an unconstrained decision to confess." United States v. Astello, 241 F.3d 965, 967 (8th Cir.) (internal quotation omitted), cert. denied, 533 U.S. 962 (2001). To state the obvious, "interrogation of a suspect will involve some pressure because its purpose is to elicit a confession." Id. "[T]he fact that the tactics produced the intended result . . . does not make [a] confession involuntary." Id. at 968. In other words, "there is nothing inherently wrong with efforts to create a favorable climate for confession." United States v. LeBrun, 306 F.3d 545, 555 (8th Cir. 2002)(internal quotation omitted). "'[Q]uestioning tactics such as a raised voice, deception, or a sympathetic attitude on the part of the interrogator will not render a confession involuntary unless the overall impact of the interrogation caused the defendant's will to be overborne.'" Astello, 241 F.3d at 967 (quoting Jenner v. Smith, 982 F.2d 329, 334 (8th Cir. 1993)). Nor will a promise of leniency, an "expressed disbelief in the statements of a suspect . . ., or lie[s] to the accused about the evidence against him" necessarily render a confession involuntary. Wilson v. Lawrence County, 260 F.3d 946, 953 (8th Cir. 2001) (internal citations omitted). Rather, the coercive conduct must be "such that the defendant's will was overborne

and his capacity for self-determination critically impaired." Astello, 241 F.3d at 967 (internal quotation omitted).

To determine whether a confession is voluntary or the product of undue coercion, we look to the totality of the circumstances. Id. Here, considering all the circumstances, including that Eng advised Santos of his rights and that the interview was about twenty minutes long, Eng's statement that Santos's children would be driving by the time he would be released from prison was not unduly coercive. Rather, it was merely an "accurate representation[] of [Santos's] predicament." United States v. Gallardo-Marquez, 253 F.3d 1121, 1123 (8th Cir.) (statement that defendant could receive life sentence not unduly coercive), cert. denied, 122 S. Ct. 570 (2001). As the late Judge Henley, sitting by designation, observed, "'telling [the] defendant in a noncoercive manner of the realistically expected penalties and encouraging [him] to tell the truth is no more than affording [him] the chance to make an informed decision with respect to [his] cooperation with the government.'" United States v. Nash, 910 F.2d 749, 753 (11th Cir. 1990) (quoting United States v. Ballard, 586 .2d 1060, 1063 (5th Cir. 1978)).

Even assuming that Eng's comment about Santos's children was unduly coercive, the district court did not err in rejecting Sanchez's "break-in-the stream" argument. Santos relied on the pre-Miranda case of Clewis v. Texas, 386 U.S. 707 (1967) (Clewis). His reliance on Clewis was misplaced. In Clewis, the Supreme Court held that a defendant's written confession was involuntary because there was "no break in the stream of events" from the time of an illegal arrest to a written confession nine days later. Id. at 710. In finding that the confession was involuntary, the Supreme Court noted that, although Miranda was not directly applicable, it was nonetheless relevant to a voluntariness determination. Id. at 709. The Court concluded that the subsequent confession was involuntary because, during the nine days the defendant had been held in custody, he had never been advised he could consult with an attorney, have one appointed, if necessary, and remain silent. Id. at

-9-

711. The Court also had "substantial concern" whether the defendant's "faculties [had been] impaired by inadequate sleep and food, [and] sickness." Id. at 712. Those factors are not present here. To the contrary, "the law enforcement authorities displayed a painstaking regard for [Santos] rights from the time of his arrest to his confession[s]." Reese v. Delo, 94 F.3d 1177, 1184 (8th Cir.) (internal quotation omitted), cert. denied, 519 U.S. 1011 (1996). Santos had been repeatedly advised and reminded of his Miranda rights and had voluntarily waived them. Before confessing to Eng, Santos had waived his rights; Dowling confirmed that Santos had been advised of his rights and reminded Santos of his rights during the seventy-minute car trip; and Hernandez re-advised Santos of his rights, and Santos again waived them. Moreover, as the government notes, Santos slept and ate a snack during the car trip with Dowling.

**Sanchez**

Sanchez first argues that the district court erred in denying his motion to dismiss the indictment on double jeopardy grounds. Reviewing the district court's decision de novo, United States v. Beeks, 266 F.3d 880, 882 (8th Cir. 2001) (per curiam), we hold the district court did not err. When, as here, "a defendant's motion gives rise to a mistrial, reprosecution is prevented only if the prosecution's 'conduct giving rise to the successful motion for mistrial was intended to provoke the defendant into moving for a mistrial,' and thus to make an end run around the Double Jeopardy Clause." Id. (quoting Oregon v. Kennedy, 456 U.S. 667, 675-76 (1982)). Sanchez does not argue, and there is no evidence to suggest, that the government intended to provoke him into moving for a mistrial. Rather, Sanchez argues that the district court should have dismissed the indictment because of governmental misconduct in failing to disclose Santos's testimony concerning Sanchez's attempted bribe. As the government notes, the district court granted Sanchez's motion for a mistrial because of unfair surprise, not because of governmental misconduct. In any

-10-

event, "[a]bsent intent to provoke a mistrial, . . . even extensive [prosecutorial] misconduct do[es] not prevent reprosectuion." Id.

Sanchez also argues that the district court erred in denying his motion for judgment of acquittal, asserting that there was insufficient evidence supporting the conspiracy and possession verdicts. In reviewing this claim, "we view the evidence in the light most favorable to the verdict and accept as established all reasonable inferences supporting the verdict." United States v. Maggard, 156 F.3d 843, 846 (8th Cir. 1998) (internal quotation omitted), cert. denied, 525 U.S. 1170 (1999). The district court did not err. Although Sanchez argues that there was insufficient evidence because Santos's testimony was incredible, "[i]t is well-established that 'it is the sole province of the jury to weigh the credibility of a witness.'" Id. at 847 (quoting United States v. Wright, 119 F.3d 630, 634 (8th Cir. 1997)). Nor did the district court err in denying his motion for new trial based on the weight of the evidence. See United States v. Campos, 306 F.3d 577, 578 (8th Cir. 2002). Sanchez also asserts that he is entitled to a new trial, because there was a material variance between jury instruction 14 and the indictment. However, he offers no supporting argument and citation, in violation of Fed. R. App. P. 28(a)(9)(A), and thus we do not address his assertion. See United States v. Echols, 144 F.3d 584, 585 n.2 (8th Cir. 1998).

Sanchez also challenges his 235-month sentence. He argues that the district court erred in imposing an obstruction-of-justice enhancement under U.S.S.G. § 3C1.1, which was based on Santos's trial testimony that Sanchez had tried to bribe him into taking responsibility for the methamphetamine. "In reviewing the enhancement for obstruction of justice, we accept as true the district court's factual findings, unless they are clearly erroneous." United States v. Armstrong, 992 F.2d 171, 174 (8th Cir. 1993). Sanchez argues that Santos's testimony concerning the attempted bribe was incredible, noting that on cross-examination, Santos admitted that a December 2000 investigative report noted that Santos had accused Arreguin,

not Sanchez, of attempting to bribe him into taking responsibility for the drugs. However, at trial Santos testified that the report was incorrect, explaining that he thought he had told the investigator that Arreguin had tried to bribe him while they were in Lexington, Nebraska, and that Sanchez had attempted to bribe him while they were in jail. While Santos's trial testimony was not supported by the investigative report, he was vigorously cross-examined about the matter. As the government notes, we must "give due regard to the district court's opportunity to judge the credibility of the witnesses." Id. at 174. Indeed, we have stated that a district court's credibility finding is "'virtually unreviewable on appeal.'" United States v. Womack, 191 F.3d 879, 885 (8th Cir. 1999) (quoting United States v. Candie, 974 F.2d 61, 64 (8th Cir. 1992)). Thus, we cannot say the district court erred in relying on Santos's trial testimony in finding that Sanchez has attempted to obstruct justice. Nor, as Sanchez argues, did the district court err, much less commit plain error, under Apprendi v. New Jersey, 530 U.S. 466 (2000), by failing to submit the obstruction-of-justice issue to the jury. As the government notes, a finding that Sanchez obstructed justice did not increase the statutory maximum sentence.

The district court also did not err in denying Sanchez's request for a role-in-the-offense reduction under U.S.S.G. § 3B1.2. At sentencing, Sanchez argued that he was entitled to a reduction because he was a mere courier for a single transaction. However,"[a] role as a courier does not automatically entitle a defendant to a downward adjustment." United States v. Alverez, 235 F.3d 1086, 1090 (8th Cir. 2000), cert. denied, 532 U.S. 1031 (2001). In addition, as the government notes, the evidence indicates that Sanchez had organized and supervised the criminal activity.

Sanchez also argues that the district court abused its discretion in refusing to grant his request for a downward departure under U.S.S.G. § 5K2.0 based on a combination of factors. However, "[t]he district court understood it had authority to depart downward and simply decided that a departure was not warranted." United States v. Larry, 126 F.3d 1077, 1079 (8th Cir. 1997) (per curiam). Thus, "the district

court's refusal to grant [Sanchez's] motion for downward departure is unreviewable."
Id.

Accordingly, we affirm the judgments of the district court.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT