**Michael PERRY**

v.

**Mark BORDLEY, et al.**

No. 03–CV–10799–RGS.

United States District Court,
D. Massachusetts.

July 18, 2005.

---

Andrew M. Fischer, Jason & Fischer, Boston, MA, Gilbert R. Hoy, Jr., Law Offices of Gilbert R. Hoy, Jr., Chestnut Hill, MA, for Michael Perry, Plaintiff.

Karen A. Glasgow, City of Boston Law Department, Boston, MA, for Boston Police Comm., City of Boston, Mark Bordley, Defendants.

## MEMORANDUM AND ORDER ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

STEARNS, District Judge.

This lawsuit against Boston police officer Mark Bordley, the City of Boston, and

former Boston Police Commissioner Paul Evans [1] arose out of the arrest of plaintiff Michael Perry on September 12, 2000. Against Bordley only, Perry asserts claims for false arrest (Count I); false imprisonment (Count II); assault (Count III); battery (Count IV); violations of the Massachusetts Civil Rights Act (Count V); and violations of 42 U.S.C. § 1983 (Count VI). Against the City of Boston and former Commissioner Evans, Perry alleges violations of 42 U.S.C. § 1983 (Count VII). [2]

### BACKGROUND

The following facts are either undisputed or presented in the light most favorable to Perry as the nonmoving party. Shortly after midnight, on September 12, 2000, Perry returned to his home in Dorchester after completing a 3:00 p.m. to 11:00 p.m. shift at Massachusetts General Hospital. He changed clothes and rode his bicycle to a nearby convenience store. Perry remained at the store with a friend, Derek Anderson, for approximately ten minutes. Shortly before 1:00 a.m., the two men left the store and mounted their bicycles. At 12:56 a.m., Boston police officers Jean Pierre Ricard and Sean McCarthy, while making an unrelated arrest on Norwell Street, heard two "popping" sounds that they believed to be gunshots. The sounds appeared to have come from Greenwood Street, approximately a block away. Neither Ricard nor McCarthy saw the presumed shooter. The officers radioed a report of gunshots, which was broadcast to other officers in the vicinity.

Upon hearing the broadcast, Bordley, who was on a nearby patrol in a marked cruiser, drove towards Greenwood Street. A minute later, as he turned onto Greenwood Street, Bordley observed Perry and Anderson seated on their bicycles at the intersection of Greenwood and Harlem Streets engaged in apparent conversation. As Bordley's cruiser approached, Perry and Anderson suddenly set off in opposite directions. [3] Anderson cycled down Greenwood Street, while Perry pedaled onto Harlem Street. [4] Bordley followed Perry, who was the closer of the two. As Bordley pulled abreast of Perry, he rolled down the window of his cruiser and asked Perry to stop. Perry did so. Bordley asked Perry where he was coming from and why he was out of breath. Perry gestured in the direction of Greenwood Street and said "from down there." (Perry maintains that he meant to indicate the variety store on the corner of Washington and Morse Streets). Bordley stepped out of his cruiser and approached Perry, who was shaking, breathing heavily, and nervous. (Perry attributes his heavy breathing to the exertion of riding the bicycle). According to Bordley, Perry avoided eye contact and glanced "furtively" up and down Harlem Street. Bordley again asked Perry where he was coming from. Perry repeated the gesture and the response "from down there." Bordley patted down Perry's outerwear. From Perry's back pocket, Bord-

---

1. Evans is named in his official capacity only.

2. The claims against the City of Boston and Evans were bifurcated and stayed while the case against Bordley proceeded. *See Wilson v. Town of Mendon*, 294 F.3d 1, 7 (1st Cir. 2002).

3. Bordley states in an affidavit that he activated his cruiser's lights as he turned the wrong way onto Greenwood Street. Perry claims in a counter-affidavit that Bordley turned on the lights only when he stepped out of his cruiser.

4. Bordley claims that Perry fled on seeing his cruiser. Perry maintains that he had no reason to believe that Bordley had any interest in him or that he had done anything wrong. According to Perry, he and Anderson had simply decided to call it a night and return to their respective homes.

ley retrieved a .38 caliber revolver containing four live rounds of ammunition. He also removed two spent shell casings. Bordley ordered Perry to lie prone on the ground. Bordley placed his foot in the small of Perry's back and held him on the ground until backup officers arrived. Bordley did not draw his service revolver.

Perry was arrested for illegal possession of a firearm, illegal possession of ammunition, and the unlawful discharge of a firearm within five hundred feet of a dwelling. He was incarcerated for twenty-eight days before posting bail. A state court judge eventually dismissed the charges against Perry after suppressing evidence of the firearm and the ammunition.[5]

*DISCUSSION*

The rules of engagement governing contacts between police and civilians vary depending on the context in which the encounter occurs. In carrying out their crime-fighting duties, police come into contact with citizens in three prototypical situations: (1) a street encounter; (2) a threshold inquiry; and (3) an arrest.[6] Each interaction has its own distinct set of rules that place progressively tighter constraints on police as the level of official intrusion intensifies. The conceptual challenge in cases like this one, where what begins as a street encounter swiftly escalates into an arrest, is to identify the point on the spectrum at which a legally significant shift in the rules occurs. The exercise is necessarily imprecise, and must be undertaken without undue reliance on hindsight. It must also recognize that police are often called upon to act in fluid, quick-changing circumstances fraught with danger.

 Police officers "do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions." *Florida v. Royer*, 460 U.S. 491, 497, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (*plurality opinion*).[7] "Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred."[8] *Terry v. Ohio*, 392 U.S. 1, 19 n.

---

5. No appeal appears to have been taken from the judge's allowance of Perry's motion to suppress. Perry appropriately makes no argument that the decision of the state court has any offensive collateral estoppel effect. A federal court is not bound by a state court's prior suppression order, whether it is based on state law or the state court's interpretation of federal law. *United States v. Charles*, 213 F.3d 10, 19 (1st Cir.2000). Moreover, there is no indication in the record of the grounds on which the motion to suppress was allowed.

6. When police are called upon to perform community duties divorced from the investigation of crime or the gathering of evidence, a different set of rules applies. In the "community caretaking" context, so long as police are acting reasonably, the Fourth Amendment does not apply at all.

7. "The person approached ... need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way.... He may not be detained even momentarily without reasonable, objective grounds for doing so; and his refusal to listen or answer does not, without more, furnish those grounds." *Id.*, 460 U.S. at 497–498, 103 S.Ct. 1319.

8. A seizure occurs when "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave," *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980), or otherwise terminate the contact with police. *Florida v. Bostick*, 501 U.S. 429, 436, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991). *Cf. United States v. Garcia*, 866 F.2d 147, 151 (6th Cir.1989)

16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). An arrest, on the other hand, must be supported by probable cause. *Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964). "[P]robable cause exists where, at the moment of arrest, the facts and circumstances within the knowledge of the police are enough to warrant a prudent person in believing that the individual arrested has committed or was committing an offense." *Commonwealth v. Santaliz,* 413 Mass. 238, 241, 596 N.E.2d 337 (1992).

█ A middle ground between a consensual encounter and a custodial arrest was staked out by the Supreme Court in *Terry v. Ohio.* A police officer may "in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." *Id.,* 392 U.S. at 22, 88 S.Ct. 1868. By "appropriate circumstances," the Court meant that police required some reasonable basis for interfering with, even briefly, a person's freedom of movement. A reasonable ground is defined as an articulable, particularized, and objective basis for suspecting criminal activity, *United States v. Cortez,* 449 U.S. 411, 417–418, 101 S.Ct. 690, 66 L.Ed.2d 621

(1981). The standard is not demanding but it requires something more definite than an inchoate suspicion or "hunch" on an officer's part. *United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989).

█ At either end of the spectrum, Bordley's actions conformed with settled constitutional rules. In following Perry onto Harlem Street in his cruiser, Bordley trenched upon none of Perry's constitutional rights. *See Michigan v. Chesternut,* 486 U.S. 567, 574–576, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988) (patrol car shadowed a running suspect). *Cf. California v. Hodari D.,* 499 U.S. 621, 626, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991) (a pursuit, unaccompanied by any application of physical force, is not a "seizure" for purposes of the Fourth Amendment). Nor was any right of Perry's implicated by Bordley's request that he stop and answer questions. *See United States v. Young,* 105 F.3d 1, 6 (1st Cir.1997) (officers asked defendant if he "got a minute" to talk); *United States v. Angell,* 11 F.3d 806, 809 (8th Cir.1993) ("Stay there, I want to talk to you"); *United States v. Adegbite,* 846 F.2d 834, 838 (2d Cir.1988) (plainclothes agents waved down defendants' truck to ask if they would answer questions).[9]

("[T]he one occurrence which seems to distinguish 'seizures' from casual contacts between police and citizens is when the defendant is asked to accompany the police or agents to a place which the defendant had not planned to go.").

9. Bordley's own account of his initial contact with Perry fits the description of a consensual encounter. Bordley agreed at his deposition that he had no facts directly implicating Perry in the shooting. The relevant testimony is as follows:

Q: And what was your basis for going after Mr. Perry?

A: Because there was just a call for shots fired in the area, and I wanted to acquire [sic], one, whether or not they could possibly

have seen anything, could have heard anything, or possibly they could have been the shooters.

Q: So you didn't have any basis to arrest Mr. Perry?

A: At that point, no.

Q: And you had no reason to suspect that he was involved in the shooting?

A: I wasn't sure at that time.

Q: Did you have any reason to believe, any evidence or basis to suspect that he was involved in the shooting?

A: At that point, I wasn't sure if he was involved or not.

Q: Let me ask you the question again, I don't think you're answering the question.

Moreover, at the conclusion of the encounter, having found a loaded revolver with two spent cartridges on Perry's person, Bordley had probable cause to arrest Perry.[10] While "[a] police officer's knowledge that an individual is carrying a handgun, in and of itself, does not furnish probable cause to believe that the individual is illegally carrying that gun," *Commonwealth v. Couture*, 407 Mass. 178, 181, 552 N.E.2d 538 (1990), "[e]vidence of possession of a gun, combined with criminal activity and flight, is enough to warrant a finding of probable cause to arrest for unlawfully carrying a firearm." *Commonwealth v. Brookins*, 416 Mass. 97, 104, 617 N.E.2d 621 (1993). *See also Commonwealth v. Haskell*, 438 Mass. 790, 793–794, 784 N.E.2d 625 (2003) (defendant observed loading a handgun at 2:00 a.m. in a high crime area). *Cf. Commonwealth v. Johnson*, 36 Mass.App.Ct. 336, 337, 631 N.E.2d 71 (1994) ("Nothing in [*Couture* ] precludes an officer from effecting a protective weapons-frisk where the officer has reason to suspect that a gun is being carried in public in a situation that objectively gives rise to public safety concerns.").

The critical turning point occurred when Bordley began the patdown of Perry's outer clothing. That a frisk implicates the Fourth Amendment was settled in *Terry v. Ohio. Id.*, 392 U.S. at 16, 88 S.Ct. 1868. Therefore, the issue is whether the patdown was constitutionally permissible. "[G]enerally, if officers have reason to believe that they are dealing with an armed and dangerous individual, they may take reasonable steps to protect themselves by frisking the individual for weapons." *United States v. Moore*, 235 F.3d 700, 703 (1st Cir.2000), citing *United States v. Taylor*, 162 F.3d 12, 17, 20 (1st Cir.1998). "The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence." *Adams v. Williams*, 407 U.S. 143, 146, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972). The critical point, which is often lost in the cases, is that while a frisk is most often an extension of an underlying *Terry* detention, the two are conceptually distinct and governed by different legal standards. "While the justification for an officer's proximity to a suspect frequently is a *Terry* stop, a patdown also may be permissible in other situations where the officer necessarily comes into contact with a person he considers dangerous." *Commonwealth v. Fraser*, 410 Mass. 541, 544–545 n. 4, 573 N.E.2d 979 (1991) (officer conducting a non-seizure field interrogation regarding a report of a man with a gun properly patted down defendant after he refused to remove his hands from his pockets).[11]

---

Did you have any facts or evidence to support any suspicion that Mr. Perry was involved in the shooting?

A: Up until that point, no.

While Bordley's testimony is instructive, it is not determinative of the outcome. "Whether a reasonable suspicion exists is treated as an objective inquiry: the actual motive or thought process of the officer is not plumbed." *Bolton v. Taylor*, 367 F.3d 5, 7 (1st Cir.2004), citing *Whren v. United States*, 517 U.S. 806, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996).

**10.** I do not understand Perry to argue otherwise.

**11.** Professor LaFave, following Justice Harlan's concurrence in *Terry*, 392 U.S. at 32–33, 88 S.Ct. 1868, takes the categorical position that where "an officer, lacking the quantum of suspicion required by *Terry* to make a forcible stop, instead conducts a non-seizure field interrogation, he may not frisk the person interrogated upon suspicion he is armed; in such a case the officer may protect himself by not engaging in the confrontation." W.R. LaFave, 4 *Search & Seizure*, § 9.6(a), at 617–618 (2004). There are cases supporting Professor LaFave's position, but as he acknowledges in the accompanying footnote 12, there are also many cases to the contrary. Despite

 Officer Bordley encountered Perry in a high crime area at 1:00 a.m. on an otherwise deserted street a block from the location where a minute before fellow officers had heard gunshots.[12] Although an individual's presence in a high crime area cannot by itself support a reasonable suspicion that he has committed, or is about to commit a crime, the presence of a suspect in a high crime area is "among the relevant contextual considerations in a *Terry* analysis." *Illinois v. Wardlow*, 528 U.S. 119, 124, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000), citing *Adams v. Williams*, 407 U.S. at 144, 147–148, 92 S.Ct. 1921. As Bordley approached Perry and Anderson, the two men immediately parted and began pedaling in opposite directions. Even if this sudden parting in the wee hours were, as Perry maintains, an innocent end to a nocturnal conversation, to a reasonable officer it could have appeared as an attempt at flight. "Headlong flight—wherever it occurs—is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such." *Illinois v. Wardlow*, 528 U.S. 119, 124, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000).[13] *Cf. United States v. Gordon*, 231 F.3d 750, 757 (11th Cir.2000) (the pace of defendant's flight is less relevant than the attempt to avoid contact with police). Bordley observed Perry to be nervous and out of breath. Perry did not maintain eye contact, but glanced repeatedly up and down the street. *See Commonwealth v. Rock*, 429 Mass. 609, 612, 710 N.E.2d 595 (1999). Twice when asked where he was coming from, Perry gestured towards Greenwood Street (where the gunshots originated). Nervous and evasive behavior is a pertinent factor in determining reasonable suspicion for a stop or a frisk. *Wardlow*, 528 U.S. at 124, 120 S.Ct. 673, citing *Sokolow*, 490 U.S. at 8–9, 109 S.Ct. 1581. *See United States v. Rideau*, 969 F.2d 1572, 1575 (5th Cir.1992) (en banc) (defendant backed away when confronted by officers). *See also United States v. McCarthy*, 77 F.3d 522, 531 (1st Cir.1996) (vague

the considerable authority Professor LaFave commands on the subject, on this point he is, in my judgment, wrong on two counts. First, a police officer, presented with a credible report of gunfire, has a duty to respond. "When a tip ... concerns the possession of a firearm, it deserves the immediate attention of law enforcement officials." *Commonwealth v. Stoute*, 422 Mass. 782, 790, 665 N.E.2d 93 (1996). The failure to investigate in such circumstances would be " 'poor police work indeed.' " *Commonwealth v. Haskell*, 438 Mass. 790, 794, 784 N.E.2d 625 (2003), quoting *Terry*, 392 U.S. at 23, 88 S.Ct. 1868. If in the course of discharging that duty, the officer acquires an objectively reasonable basis to fear for his safety, a rule prohibiting him from taking precautionary measures is neither desirable as a matter of law nor common sense. *See United States v. Davis*, 202 F.3d 1060, 1063 (8th Cir.2000) ("The danger to officer safety that justifies a protective search may arise after a consensual encounter or investigative stop has commenced."). Second, I disagree with Professor LaFave's premise that an officer who initiates a consensual encounter lacks a legitimate basis for being in the proximity of the person he approaches. This premise is contrary to Supreme Court law validating the right of police officers to undertake such approaches without any basis for suspecting criminal wrongdoing. *Muehler v. Mena*, —— U.S. ——, ——, 125 S.Ct. 1465, 1471, 161 L.Ed.2d 299 (2005), citing *Bostick*, 501 U.S. at 434–435, 111 S.Ct. 2382.

12. While the stop and the frisk are conceptually distinct, a determination of the propriety of both is influenced by common factors, such as the nature of the surrounding area, the time of day, the seriousness of the crime being investigated, and a suspect's furtive behavior.

13. In *Wardlow*, a divided Supreme Court ruled that only two suspicious factors, the defendant's presence in an area of heavy narcotics trafficking and his unprovoked flight from police, when taken together, were sufficient to justify a *Terry* stop. *Wardlow*, 528 U.S. at 124–125, 120 S.Ct. 673.

and evasive responses to an officer's questions). Viewed from the perspective of an experienced officer, the cumulative circumstances—the contemporaneous report of gunshots on an adjacent street, the late hour, a crime-infested neighborhood, Perry's attempted flight, excessive nervousness, and evasive answers, gave Bordley a reasonable basis to believe that he might be armed and dangerous.[14] *See United States v. Arvizu,* 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002). Seemingly innocent behaviors and circumstances, when taken as a whole, can create a reasonable suspicion. *See Sokolow,* 490 U.S. at 9–10, 109 S.Ct. 1581. While by no means an open and shut case, I conclude that even if Bordley lacked sufficient articulable facts to justify a *Terry* stop—a matter fairly open to debate—a detention or

seizure in the Fourth Amendment sense did not occur until after the frisk revealed the firearm. While the frisk itself implicated the protections of the Fourth Amendment, the standard governing a *Terry* stop (articulable suspicion) is different from the standard governing a frisk (a reasonable suspicion that a suspect might be armed and dangerous). If Bordley's actions did not meet the *Terry* detention standard, they met the standard justifying a protective frisk.[15] Consequently, Bordley's motion for summary judgment will be *ALLOWED.*[16]

▮ Perry has not opposed the motions of the City of Boston and Commissioner Evans for summary judgment on his § 1983 count. This count alleges that the City and Evans (who is duplicatively named in his official capacity) adopted,

14. While Bordley in his deposition did not articulate a fear for his personal safety, there is no requirement that an officer testify to having been "scared" by a threat of possible harm "so long as it is clear that he was aware of specific facts which would warrant a reasonable person to believe he was in danger." *United States v. Tharpe,* 536 F.2d 1098, 1101 (5th Cir.1976) (en banc) (noting that some "foolhardy" officers will never admit fear).

15. Even if the court is wrong in its assessment that the right to conduct a frisk arises independently of the right to conduct a *Terry* stop, Bordley would have a strong argument for qualified immunity. Assuming that the frisk violated a Fourth Amendment right of Perry's, the question remains whether the right not to be frisked in the context of a consensual encounter was (or is) clearly established. *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). The answer has to be "no," as the cases noted by Professor LaFave illustrate. *Compare United States v. Burton,* 228 F.3d 524, 528 (4th Cir. 2000) ("[B]efore Officer Burke was entitled to allay his safety concerns and conduct a protective search, he had to be presented with objective facts that would justify an investigatory *Terry* stop ....") *with United States v. Flippin,* 924 F.2d 163, 166 (9th Cir.1991) (following a suspicionless consensual entry, a

patdown is permissible if it is independently justified by a reasonable suspicion that an occupant of the dwelling is armed). "If judges ... disagree on a constitutional question, it is unfair to subject police to money damages for picking the losing side of the controversy." *Wilson v. Layne,* 526 U.S. 603, 618, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999). Bordley, who frames his argument around the propriety of a *Terry* stop, maintains that the "reasonable suspicion" area of law was in flux at the time of his encounter with Perry, as evidenced by the Supreme Court's divided ruling in *Wardlow. See United States v. Woodrum,* 202 F.3d 1, 8 (1st Cir.2000).

16. Perry has also not briefed his claim that Bordley used excessive force in effecting his arrest by ordering him to lie prone and placing his foot in the small of his back. The court therefore deems this claim (and the associated common-law assault and battery claims) to be waived. The false arrest and imprisonment claim and the claim of a violation of the Massachusetts Civil Rights Act are precluded by the court's finding that Bordley had probable cause to arrest Perry after the discovery of the firearm and ammunition on Perry's person. *See Brown v. Bryan County,* 53 F.3d 1410, 1415 (5th Cir.1995); *Rose v. Town of Concord,* 971 F.Supp. 47, 51–52 (D.Mass.1997).

promulgated, or acquiesced in a policy of failing to reasonably and adequately train, supervise and discipline its police officers. (Amended Complaint, at ¶ 59). Under *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), a municipality cannot be found liable under § 1983 unless an established policy or custom caused a constitutional injury.[17] Because Perry has failed to show such an injury, his § 1983 claim against Evans and the City of Boston necessarily fails. *See Los Angeles v. Heller*, 475 U.S. 796, 799, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986).

### ORDER

For the foregoing reasons, the motions of defendants Bordley, Evans, and the City of Boston for summary judgment are *ALLOWED.*

SO ORDERED.

---

17. *Monell* rejected the proposition that a municipality could be held liable under a theory of *respondeat superior* for violations of § 1983 by its employees. *Id.*, 436 U.S. at 691, 98 S.Ct. 2018.