

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

Nos. 07-11-00039-CR, 07-11-00040-CR

MARTHA HERNANDEZ, APPELLANT

V.

THE STATE OF TEXAS, APPELLEE

On Appeal from the 331st District Court
Travis County, Texas
Trial Court Nos. D-1-DC-09-500099, D-1-DC-09-900170,
Honorable Bob Perkins, Presiding

January 17, 2014

## OPINION

Before QUINN, C.J., and CAMPBELL and HANCOCK, JJ.

A jury convicted appellant Martha Hernandez of murder[1] and tampering with or fabricating physical evidence[2] and sentenced her to terms in prison of sixty and twenty years respectively. The trial court ordered that the sentences run concurrently. Through four issues she complains on appeal that the trial court erred in failing to

---

[1] TEX. PENAL CODE ANN. § 19.02 (West 2011).

[2] TEX. PENAL CODE ANN. § 37.09 (West Supp. 2013).

suppress her recorded statement and certain testimony from her sister-in-law. We will overrule each of appellant's issues and affirm the judgments of the trial court.

## Background

Appellant does not challenge the sufficiency of the evidence supporting her convictions so we will discuss only so much of the evidence as necessary to the disposition of the appeal. In the early morning of February 25, 2009, a burning human corpse was discovered beside a road near an intersection in rural Travis County. A homicide investigation ensued. Among the physical evidence found at the scene was a military identification card belonging to appellant.

Forensic analysis showed the body was that of 21-year-old Christy Lynne Espinosa. The medical examiner determined that at the time of death Espinosa had a blood alcohol level of 0.28 and had ingested marijuana and several prescription medications. But the drug concentrations were at non-lethal levels. The examiner also noted Espinosa had sustained a non-lethal neck injury before death. Based on the autopsy and toxicology results the medical examiner concluded Espinosa was dead when the fire began. The cause of death, in the medical examiner's opinion, was suffocation. Tests of Espinosa's clothing and of soil underneath her body showed it had been doused with gasoline before being ignited.

Through their investigation, officers learned appellant was married to Kenneth Hernandez. But attempts to contact appellant by telephone were not successful. By March 5, 2009, officers were in communication with Kenneth's sister, Rebecca Hernandez. Rebecca told them appellant was in Mexico. Rebecca indicated to law

enforcement that she and Kenneth wished to travel to Mexico and return appellant to the United States. Suppression hearing evidence showed officers did not authorize the trip to Mexico for appellant's return but made arrangements for her arrest on an unrelated warrant after she entered the United States.

On March 7, appellant was arrested in Eagle Pass. Authorities surrendered her to Travis County deputies to whom she gave a recorded statement before returning to Austin in their custody. Appellant gave officers a second statement on March 8 and a third statement on March 9. The third interview began after 11:00 p.m. and continued until about 3:00 a.m.

In her March 7 recorded statement, appellant said she went to several 6th Street bars during the evening of February 24 and early morning hours of February 25. She denied she was with her husband and claimed she was driven home by individuals she met that evening. She denied knowing Espinosa. Asked about her identification card lying next to Espinosa's body, she said her purse had been stolen.

By her March 8 statement, appellant acknowledged she and her husband had gone to 6th Street together, to celebrate Mardi Gras, and met Espinosa outside a bar. According to appellant's statement, after leaving one bar and being denied admittance to another because it was full, the three went to Kenneth's vehicle for cigarettes. They left in the car and drove to a convenience store on 51st Street, where Kenneth bought orange juice which they mixed with alcohol from a bottle in the car. They drove around, traveling at one point through a toll booth on Highway 183. After they realized Espinosa had lost consciousness, Kenneth bought a gasoline can and gasoline at another

3

convenience store, drove to Hog Eye Road, removed Espinosa from the car, and poured gasoline over her body. At his direction, appellant located a cigarette lighter and gave it to Kenneth, who lit the body afire.

The March 8 statement also included the information that Kenneth contacted appellant after Espinosa's body was discovered. He told appellant she was in trouble and that she should say they had not been together on the evening of the 24th.

Appellant's March 9 statement added details regarding Espinosa's death. By this statement, appellant said that Espinosa became sick in the car after they left the convenience store on 51st Street. Early in this interview appellant continued to maintain that Espinosa simply died after becoming unconscious. Her story changed, however, after a second detective, Craig Smith, spoke with her. She told that when she commented to her husband that Espinosa had grown quiet, he said he had given her some "bars."[3] She also told that both she and her husband had placed their hands over Espinosa's mouth. She further admitted that she "might have hurt [Espinosa's] head" by pulling her back to place her hand on her face.[4] Appellant said, however, that as her husband continued to place his hand over Espinosa's mouth, she "just put [her] head down and blocked everything out." She denied killing Espinosa and said she acted out of fear of her husband. Although she acknowledged there was "wrapping paper" in the car, she denied it was used to suffocate Espinosa.

---

[3] In testimony at trial an officer agreed that "bars" is a street name for Xanax.

[4] Appellant said that by that point in their drive Espinosa was in the front passenger seat and appellant in the back.

4

Appellant was indicted and moved to suppress the recorded statements. Following several pre-trial hearings, all grounds alleged for suppression were denied. The case proceeded to trial where a jury found appellant guilty of murder and tampering with physical evidence, and assessed punishment as noted.

Analysis

On appeal, appellant's suppression issues are limited to her March 9 statement. In her first three issues, appellant contends the trial court erred by denying the motion to suppress the March 9 statement because: (1) the statement was rendered involuntary by detective Smith's repeated references during questioning to appellant's separation from her children, which violated her due process rights; (2) the statement was rendered involuntary by the detective's promises of leniency for cooperation and threats for lack of cooperation in violation of due process; and, (3) the statement was prompted by a promise of benefit in violation of article 38.21 of the Code of Criminal Procedure.

Issues One through Three

The appellate record contains both a copy of the March 9 recording and a written transcription. The facts surrounding taking the statement are not contested; rather, it is the outcome on application of law to the facts which brings the parties into disagreement. We will therefore review the trial court's ruling on the motion to suppress

appellant's statement *de novo.* *Oles v. State,* 993 S.W.2d 103, 106 (Tex. Crim. App. 1999).[5]

At the hearing on a motion to suppress a statement on the ground of involuntariness, it is the State's burden to prove by a preponderance of the evidence that the defendant's statement was given voluntarily. *Tello v. State,* No. 14-06-00525-CR, 2007 Tex. App. LEXIS 6658, at *5 (Tex. App.—Houston [14th Dist.] Aug. 21, 2007, pet. refused) (mem. op., not designated for publication) (citing *Alvarado v. State,* 912 S.W.2d 199, 211 (Tex. Crim. App. 1995)). *See also Gentry v. State,* 770 S.W.2d 780, 789 (Tex. Crim. App. 1988) ("The burden of proving that a confession was rendered voluntarily is on the state").

"A statement is obtained in violation of constitutional due process only if the statement is causally related to coercive government misconduct." *Contreras v. State,* 312 S.W.3d 566, 574 (Tex. Crim. App. 2010) (citing *Colorado v. Connelly,* 479 U.S. 157, 163-64, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986)). A statement is rendered involuntary if by the coercive conduct of law enforcement a person's will is overborne and her capacity for self-determination critically impaired. *Contreras,* 312 S.W.3d at 574 (citing *Schneckloth v. Bustamonte,* 412 U.S. 218, 225-26, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)). Determining its voluntariness requires examination of the totality of the circumstances under which the statement was obtained. *Delao v. State,* 235 S.W.3d 235, 239 (Tex. Crim. App. 2007) (citing *Arizona v. Fulminante,* 499 U.S. 279, 285-86, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991)). Assessing the totality of the circumstances

---

[5] *Cf. Miller v. Fenton*, 474 U.S. 104, 110-18, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985) (analyzing federal treatment of voluntariness of confession as legal rather than factual question).

concerns both the characteristics of the accused and the details of the interrogation. *Bustamonte,* 412 U.S. at 226.

The law permits police some use of psychological tactics to obtain the statement of a suspect. *Henderson v. Hendricks,* 02-4338 (MLC), 2005 U.S. Dist. Lexis 32897 at *31 (D.N.J. Dec. 13, 2005) (not designated for publication); *Miller v. Fenton,* 796 F.2d 598, 605 (3d Cir. 1986). Thus, for example, an interviewer may play on the suspect's sympathies or explain that honesty may be the best policy for a suspect hoping for leniency. *Miller,* 796 F.2d at 605; *Rachlin v. United States,* 723 F.2d 1373, 1378 (8th Cir. 1983) (although agents told suspect it was in his best interest to cooperate, resulting confession was voluntary); *United States v. Vera,* 701 F.2d 1349, 1363-64 (11th Cir. 1983) (same). "These ploys may play a part in the suspect's decision to confess, but so long as that decision is a product of the suspect's own balancing of competing considerations, the confession is voluntary." *Miller,* 796 F.2d at 605.

"[C]ases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of *Miranda* [*v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)] are rare." *Berkemer v. McCarty,* 468 U.S. 420, 433 n.20 & 433, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984). This is logical because "[t]he purposes of the safeguards prescribed by *Miranda* are to *ensure* that the police do not coerce or trick captive suspects into confessing, to relieve the inherently compelling pressures generated by the custodial setting itself, which work to undermine the individual's will to resist, and as much as possible to free courts from the task of scrutinizing individual

7

cases to try to determine, after the fact, whether particular confessions were voluntary." *Id.* (emphasis in original, footnotes and quotation marks omitted).

After she was returned to Austin from Eagle Pass, appellant was held at the Travis County jail. The March 8 and March 9 interrogation sessions occurred in police offices at another location. Both sessions were recorded by video. The March 8 session began about 4:30 in the afternoon and ended about 7:00 that evening. After the session, appellant rode with officers to locations to which she said she and Kenneth had driven with Espinosa.

As noted, the March 9 interrogation session occurred during a four-hour period beginning about 11:00 p.m. Detective Greg Lawson was the primary questioner during both sessions.

Appellant does not contend the physical circumstances of her interrogation were unduly coercive. She points only to the facts that the March 9 session was her third interrogation in 48 hours, and that it began at a late hour "when most individuals are fatigued from the day." We see no indication from the record that appellant's inculpatory statements were influenced by fatigue. During the session, she did not complain of tiredness or any other circumstance of her questioning. When Lawson asked appellant what she was doing before being brought to the interrogation, appellant said she "was fixing to go lay down and read."

Appellant's brief also points to her relatively young age,[6] and contains an assertion that the content of her three statements reflects "she had a passive and easily

---

[6] At the time of her three statements, she was age twenty-six.

dominated personality."  Appellant told officers she feared and was dominated by her husband, and her narrative reflects her actions on many occasions were influenced by other family members.  But we do not agree the record shows she was passive or easily dominated in her dealings with the officers.  To the contrary, the recordings of the interviews contain many instances in which she disagreed with statements of her questioners.  Nor can we agree that any of her characteristics she mentions or the general circumstances of her interrogation rendered appellant especially susceptible to coercion.

Appellant's contentions supporting her argument for exclusion of her March 9 statement arise from statements made by Detective Smith.  As at the outset of the March 7 and March 8 interrogation sessions, appellant was read the *Miranda* warnings.  Smith entered the room about forty-five minutes into the March 9 session after Lawson had reviewed with appellant the substance of her March 8 statement, had further questioned her about the precise cause of Espinosa's death, and had probed about Kenneth's actions toward Espinosa.  Lawson's questioning suggested Kenneth had a sexual interest in Espinosa, and suggested Kenneth might say appellant killed Espinosa out of jealousy.[7]

Early in his questioning, Smith confronted appellant with autopsy results showing Espinosa did not die from alcohol or drugs.  Smith pressed appellant to "get past" the "I'm going to cover for [Kenneth], he's going to cover for [me]" posture, and made vague

---

[7] It is worth noting that as Lawson introduced Smith to appellant, and asked if it was "all right with you" if Smith participated in their conversation, he also reminded appellant "you still have the right to remain silent, and you still can terminate the interview at any time . . . ."

9

references to other evidence recently discovered that "brought us back to you." Smith also invoked other interrogation techniques. Appellant contends that two of them had such effect as to render her subsequent admissions involuntary. By her first issue, she points to Smith's statements emphasizing the separation from her children that would result from her failure to cooperate. By her second, she argues Smith promised she would gain leniency by cooperation and threatened that failure to cooperate would precipitate a report to the judge and district attorney and punishment. In these ways, appellant contends, Smith coerced her incriminating statements.

Before considering the effect of Smith's statements, we emphasize again that our analysis must consider the totality of the circumstances under which appellant's statements were given. Under that analysis, the assertedly coercive police activity is not considered alone, but as a factor in the determination of voluntariness. *See Fulminante,* 499 U.S. at 285 (noting "but for" test based on *Bram v. United States,* 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897), does not state standard for determining voluntariness of confession under current law); *United States v. Fernandes,* No. 07-51100, 285 F. Appx. 119, 124, 2008 U.S. App. Lexis 14780 (5th Cir. 2008) (per curiam, not designated for publication) (citing *Hawkins v. Lynaugh,* 844 F.2d 1132, 1140 (5th Cir. 1988) (noting existence of a promise constitutes but one factor in the totality of circumstances analysis and does not render a confession involuntary *per se*)); *Miller,* 796 F.2d at 608 (despite *Bram*, courts have treated promises as part of totality of circumstances in assessing voluntariness of confessions). The coercive conduct, however, must cause the confession to render it involuntary. *Colorado v. Connelly*, 479 U.S. at 167; *Fernandes*, 285 Fed. Appx. at 124.

*Interrogation Relating to Appellant's Children*

In support of her argument that Detective Smith used improper references during interrogation to separation from her children, appellant points to the detective's following statements.

> That's why we've got to make this right. I know that you know that. You've got kids of your own.

> I know that you are a good mom. I know that you are trying everything you can to take care of your kids, to take care of yourself so that you can take care of your kids. But right now your kids are who you need to be thinking about, because if you're not thinking about your kids, and you continue to not tell the truth, you're never going to see those kids again. Do you understand that? Going to prison for the rest of your life is not watching your kids grow up, it's not putting your kids through school, it's not giving you're (sic) their . . . (sic) their first girlfriend and boyfriend, and their first wife and husband, and their first kids, and being a grandma.

> You do what you do as far as taking care of it, and then you go back to your kids, and you get to spend some of your life with your kids. Because without telling the truth, you are never going to see your children again. I don't have any kids, and I can't imagine when I do the thought of something keeping me away from my kids for the rest of my life. And if I make a mistake, and I've got to fess up to it, and I'm not around my kids for whatever amount of time, at least I'll know I'm coming back to them at some point.

> But right now, the track that you're on, you're on the track that's getting further and further and further away from those kids.

> And the path you're on right now is the worst path it is, because it's you going to prison for the rest of your life, and you get to see your kids through the little glass wall. I guess I would say you won't get to see them, because you will get to see them through a little glass wall and talk to them on a telephone. You'll never get to touch them. You'll never get to tuck them in at night. You'll never get to feed them breakfast again. . . .

Citing the "primordial and fundamental value of our society" associated with the relationship between parent and child, and the impropriety of law enforcement officers "deliberately prey[ing] upon the maternal instinct," in a 1981 decision the Ninth Circuit

based its conclusion a 21-year-old defendant's confession was coerced and involuntary primarily on officers' statements that "caused her to fear that she would not see her child for a long time if she refused to cooperate." *United States v. Tingle,* 658 F.2d 1332, 1335-36 (9th Cir. 1981).

Other courts confronted with similar statements by police, made under different circumstances, have not found them so coercive as to render the defendant's actions involuntary. *See, e.g., United States v. Kolodziej,* 706 F.2d 590, 595 (5th Cir. 1983) (consent to taped telephone call). In *United States v. Santos-Garcia,* the interrogating officer told a twenty-year-old suspect, who was operating a vehicle carrying about twenty-two pounds of methamphetamine, that his story did not make sense and his children would be driving by the time he was released from prison. 313 F.3d 1073, 1076 (8th Cir. 2002). The suspect then admitted knowing the vehicle contained methamphetamine. *Id.* In analyzing the voluntariness of the confession, the court noted he was advised of his rights, the interview lasted about twenty minutes, and the interrogator's representation of the length of a prison sentence was nothing more than "an accurate representation of [the defendant's] predicament." *Id.* at 1079 (quotation marks and brackets omitted) (quoting *United States v. Gallardo-Marquez,* 253 F.3d 1121, 1123 (8th Cir. 2001)). The court found the interrogator's comment did not deprive the defendant of his ability to make an unconstrained decision to confess. *Id.*

The court in *Kolodziej* noted that the "situation of consent . . . might well be different if the consensual cooperation had been secured by actual threats of a physical nature or of prosecutorial action which had no realistic foundation." 706 F.2d at 595 (quoting *United States v. Horton,* 601 F.2d 319, 322-23 (7th Cir.1979)). Detective Smith

12

did not tell appellant that he or the government would take her children if she did not tell them what she knew about Espinosa's death. *Cf. Lynumn v. Illinois,* 372 U.S. 528, 534, 83 S.Ct. 917, 9 L.Ed.2d 922 (1963) (holding in pre-*Miranda* case that confession was not voluntary when made after police told woman her children would be taken from her and their state financial aid terminated if she did not cooperate). Nor did he represent to her that she could avoid the consequences of her involvement in the death by cooperating.

By her unchallenged second statement, appellant had placed herself in the car with Kenneth and Espinosa at the time of Espinosa's death. It is clear from her statements appellant had fear her husband would lie to protect himself.[8] Smith and Lawson played on that fear, but such an interrogation strategy does not, as a matter of law, render a confession involuntary. *United States v. Ballard,* 586 F.2d 1060, 1063 (5th Cir. [Fla.] 1978). Nor does their reminder to appellant of the potentially lengthy sentence of confinement facing her if she were convicted of murder. *Id.*

Considered as a whole and in the context of the entirety of the interrogation, we find Smith's statements emphasizing to appellant that she faced separation from her children were not threats of governmental action to punish a failure to cooperate but

---

[8] Statements appellant made during the March 8 questioning highlight appellant's distrust of her husband and her fears he would implicate her in the murder. At a critical point during the March 8 questioning at which appellant became more forthcoming regarding the events leading up to Espinosa's death, she began by referring to statements Kenneth had made to her since the murder, and complaining to Lawson, "And I mean I don't understand why he's lying." From that point she launched into a detailed recitation of events occurring before and after the murder, focusing on Kenneth's treatment of her. Her narrative recitation occupies more than six single-spaced pages of the transcript of the March 8 interrogation, interrupted only once by a question from Lawson.

13

were accurate representations of her predicament. Moreover, considering the entirety of the circumstances facing her, we could not say these particular statements overcame her free will and caused her to further implicate herself in the murder. *See Ballard,* 586 F.2d at 1063 ("[d]etermining whether a confession is voluntary requires an assessment of human motivation and behavior. One factor, by itself, is seldom determinative").

*Inducement to Confess by Promises and Threats*

Appellant next contends Detective Smith promised she would gain leniency by cooperation and threatened that failing to cooperate would precipitate a report to the judge and district attorney and punishment. She directs us to the following statements by Detective Smith.

> [W]e're hoping in turn you're going to turn around and you're going to tell us the truth about everything that happened so that we can get everything figured out because Christy being dead, something has to happen about that, okay? And either we go the long way about finding it, finding out that happens, and we then go to the judge and we say, okay, here's the final product. Here's what we learned. And we either got cooperation along the way. Or we go and we say, okay, it took a little while, but we put this case together, and we finally got some cooperation, and we think that we've got all of the truth and the people involved were cooperative in this, and realize it was a mistake. Some things got screwed up and now I'm needing to talk about it because it's the right thing to do.
>
> I have to present something to the judge and I have to present something to the DA's office and right now, right now the DA's office has already told us, "Murder. Put them in jail and just be done. You have her ID at the scene. You have them together. Just be done. Be done with your paperwork." But what's happened is we have decided that we need to try to talk and give you an opportunity to try and make this right. And the way to make it right is to say, "okay, this is exactly what happened and I need to be cooperative so that hopefully I can get a little bit of leniency through this whole thing," alright?
>
> [W]e're trying to give you the opportunity to show that you have some type of compassion and that it's eating you up inside to not tell us the

14

truth and that you need to tell the truth so that you can show that you have some type of feeling left in you.

[T]hat's the kind of stuff that I have to hear from you so that I can say, "Judge, she did the right thing." Martha, I need you to dig yourself out of here.

Appellant argues the coercive aspect of Detective Smith's comments derives from the threat that cooperation is rewarded while failure to cooperate is punished.

But, again, resolution of the voluntariness question does not turn on the mere existence of some promise or threat, but on the totality of the circumstances of the interrogation. *See Fulminante,* 499 U.S. at 285; *Bustamonte,* 412 U.S. at 226 (noting "significant fact" among cases cited is that none turned on the presence or absence of a single controlling factor but instead reflected "a careful scrutiny of all the surrounding circumstances"). *Cf.* George E. Dix, *Promises, Confessions, and Wayne LaFave's Bright Line Rule Analysis,* 1993 U. Ill. L. Rev. 207, 225-29 (1993) (discussing abandonment of *Bram* standard and resulting dangers of "station house plea-bargaining"). *See also United States v. LeBrun* 363 F.3d 715, 725-26 (8th Cir. 2004) (finding even if the interrogator's statements could be reasonably interpreted as a promise of no prosecution, the defendant's confession was deemed voluntary as the police had not overborne his will and capacity for self-determination); *United States v. Larry,* 126 F.3d 1077, 1079 (8th Cir. 1997) (per curiam) (holding the accused's statement implicating himself as a felon in possession of ammunition was voluntary even though induced by a promise of non-prosecution for a separate offense involving a drive-by shooting); *Tippitt v. Lockhart,* 859 F.2d 595, 598 (8th Cir. 1988) (concluding that the accused's confession was voluntary despite officers' fulfilled promise of non-prosecution for capital murder in exchange for a confession); *Ballard,* 586 F.2d at 1063

(promising to make known a defendant's cooperation to the trial court or prosecutor does not of itself establish the will of the defendant was overcome); *State v. Pinder,* 250 Conn. 385, 736 A.2d 857, 879-881 (1999) (deeming confession voluntary notwithstanding police statement that defendant would be "better off" if he told the truth where, *inter alia,* the defendant was offered no specific assurances giving a statement would affect the outcome of the proceedings).

Here appellant gave two lengthy statements before the one she now challenges. Before each statement, she received the *Miranda* warnings and expressed her understanding. As noted, aspects of the *Miranda* warnings were reiterated at least once during the March 9 interrogation. At no time during the March 9 interrogation did appellant request an attorney or termination of the interview. She neither complained of the circumstances of her questioning nor asserted a request that was denied. Detective Smith did not offer a *quid pro quo* of leniency for a confession nor did he expressly threaten added or heightened punishment for failure to confess. Appellant had prior arrests, and was familiar with police procedure. Nothing indicates she was of any level less than average intelligence. By the time she gave her March 9 statement, over twenty-four hours had elapsed since appellant had given her unchallenged second statement, in which she acknowledged her presence in the car during all the events leading to Espinosa's death and told of her role in the burning of the body. Neither appellant's characteristics nor the details of her interrogation on March 9 suggest that her will was overborne and her capacity for self-determination critically impaired by Smith's vague references to presenting "something to the judge."

16

*Article 38.21 Violation*

By her third issue, appellant contends Detective Smith improperly induced her to make a statement by promising to report to the judge if she "did the right thing." The questioned statements are apparently the following:

> "And the way to make it right is to say, 'Okay, this is exactly what happened, and I need to be cooperative so that hopefully I can get a little bit of leniency through this whole thing,' all right."
>
> \*\*\*
>
> "[T]hat's the kind of stuff that I have to hear from you so that I can say, 'Judge, she did the right thing.' Martha, I need you to dig yourself out of here."

Under Texas statutory law, the statement of an accused may be used against her "if it appears that the same was freely and voluntarily made without compulsion or persuasion." TEX. CODE CRIM. PROC. ANN. art. 38.21 (West 2005). Voluntariness of a statement under article 38.21 is determined by examining the totality of the circumstances. *Delao,* 235 S.W.3d 235, 239 (citing *Fulminante,* 499 U.S. at 285-86); *Creager v. State,* 952 S.W.2d. 852, 855 (Tex. Crim. App. 1997).[9]

We see no error in the trial court's refusal to suppress appellant's March 9 statement. It is unnecessary for us to restate why under the totality-of-circumstances analysis appellant's statement was not involuntary. Moreover, Detective Smith offered appellant no positive promise of leniency or beneficial outcome. Appellant's requested

---

[9] Courts sometimes have stated a different test for voluntariness of a promise-induced confession under article 38.21, considering whether the promise was positive, made or sanctioned by someone in authority, and of such an influential nature that it would cause a defendant to speak untruthfully. *Martinez v. State,* 127 S.W.3d 792, 794 (Tex. Crim. App. 2004) (citing *Fisher v. State,* 379 S.W.2d 900, 902 (Tex. Crim. App. 1964)). We would reach the same result on this issue by applying that test.

cooperation carried the *hope* of "get[ing] a little bit of leniency through this whole thing." And nothing here demonstrates any actual or apparent authority in Detective Smith to negotiate a lesser charge or reduced sentence for appellant. We think it unreasonable to believe a person would speak untruthfully, confessing to acts she did not commit, on the strength of the vague statements challenged under this issue.

We overrule appellant's first, second, and third issues.

Issue Four

Through her fourth issue, appellant asserts the trial court abused its discretion by failing to suppress a statement her sister-in-law Rebecca Hernandez attributed to appellant. Appellant sought suppression of the statement which the trial court denied after a pre-trial hearing. Over appellant's further objection at trial, Rebecca testified to her conversation with appellant in a motel room.

Appellant argues the statement was wrongfully obtained because she was then unlawfully restrained by Kenneth and Rebecca through conduct amounting to kidnapping or unlawful restraint. Thus, appellant argues, the statement was inadmissible under Code of Criminal Procedure article 38.23.

After Espinosa's death, appellant traveled to Mexico. Kenneth and Rebecca joined her and appellant returned to Texas with them. At a motel in Mexico appellant made an assertedly inculpatory statement to Rebecca. The following day, as they entered Texas at Eagle Pass, appellant was arrested. According to Rebecca's testimony at the suppression hearing, appellant voluntarily returned with her and Kenneth to Texas. Appellant did not testify.

18

Because the issue implicates the trial court's fact finding and credibility determinations we apply a bifurcated standard of review, giving almost total deference to a trial court's determination of historic facts and mixed questions of law and fact that rely upon the credibility of a witness, but applying a *de novo* standard of review to pure questions of law and mixed questions that do not depend on credibility determinations. *Martinez v. State,* 348 S.W.3d 919, 922-23 (Tex. Crim. App. 2011) (citing *Guzman v. State,* 955 S.W.2d 85, 87-89 (Tex. Crim. App. 1997)). The trial court is the sole judge of the credibility of the witnesses and the weight given their testimony. *Ex parte Moore,* 395 S.W.3d 152, 158 (Tex. Crim. App. 2013). We review the suppression hearing record in the light most favorable to the trial court's ruling and must sustain the decision if it is reasonably supported by the record and is correct under any theory of law applicable to the case. *Id.* The trial court prepared written findings of fact and conclusions of law concerning the issues raised by appellant's motion to suppress. Among other things it found appellant voluntarily returned to the United States.

A defendant moving for suppression under article 38.23 on the claim of a statutory violation bears the burden of producing evidence of the violation. *State v. Robinson,* 334 S.W.3d 776, 779 (Tex. Crim. App. 2011). Only if the defendant meets this burden does the burden shift to the State to prove compliance. *Id.*

In part pertinent to appellant's present issue, article 38.23 provides:

No evidence obtained by an officer or other person in violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America, shall be admitted in evidence against the accused on the trial of any criminal case.

TEX. CODE CRIM. PROC. ANN. art. 38.23(a) (West 2005). A person commits the offense of kidnapping if the person intentionally or knowingly abducts another person. TEX. PENAL CODE ANN. § 20.03(a) (West 2011). "Abduct" includes restraining a person with intent to prevent her liberation by secreting or holding her in a place where she is not likely to be found. TEX. PENAL CODE ANN. § 20.01(2)(A) (West 2011). A person commits unlawful restraint if she "intentionally or knowingly restrains another person." TEX. PENAL CODE ANN. § 20.02(a) (West 2011). "Restrain" as used by §§ 20.01(2)(A) and 20.02(a) means to restrict a person's movements without consent, so as to interfere substantially with the person's liberty, by moving the person from one place to another or by confining the person. TEX. PENAL CODE ANN. § 20.01(1) (Vernon 2011). Restraint is without consent if it is accomplished by force, intimidation, or deception. TEX. PENAL CODE ANN. § 20.01(1)(A) (West 2011).

Appellant's contention is that Kenneth and Rebecca restrained her by deception. She cites cases establishing the proposition that consent is ineffective if obtained through the deceptive representations of another.[10] Thus underlying her claim of a violation of article 38.23 is the assertion she was deceived by representations of her husband and his sister. But as noted appellant did not testify at the suppression hearing, so we know not what she was told, understood or believed regarding their intentions as she traveled with them toward the border. Nor did the court hear from any other witness of deceptive representations made to appellant. With respect to the issue

---

[10] *Gordon v. State,* 633 S.W.2d 872, 874-75 (Tex. Crim. App. 1982); *Higginbotham v. State,* 356 S.W.3d 584, 590 (Tex. App.—Texarkana 2011, pet. refused); *Rabb v. State,* 835 S.W.2d 270, 271-72 (Tex. App.—Tyler 1992, no pet.); *Pack v. State,* 651 S.W.2d 389, 392 (Tex. App.—Fort Worth 1983, pet. refused); *State v. Bible,* 175 Ariz. 549, 858 P.2d 1152, 1207 (Az. 1993).

of appellant's consent to their return to the United States, the only evidence was of her intention to return voluntarily.

On this record, appellant did not meet her burden of proof at the suppression hearing. *Robinson,* 334 S.W.3d at 780-82 (Cochran, J., concurring). Thus, the trial court was authorized in finding the admission of appellant's statement to Rebecca was not barred by article 38.23. In the same way, to the extent appellant also complains that the trial court abused its discretion by allowing Rebecca to testify at trial to appellant's statement, the record shows no error. We overrule appellant's fourth issue.

Conclusion

Having overruled appellant's four issues, we affirm the judgments of the trial court.

James T. Campbell
Justice

Publish.