

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

|  |  |  |
|---|---|---|
| ANTONIO LOPEZ, | § | No. 08-17-00039-CR |
|  | § |  |
| Appellant, | § | Appeal from |
|  | § |  |
| v. | § | 171st District Court |
|  | § |  |
| THE STATE OF TEXAS, | § | of El Paso County, Texas |
|  | § |  |
| Appellee. | § | (TC # 20120D04452) |
|  | § |  |

## O P I N I O N

A jury found Appellant Antonio Lopez guilty of the murder of 11-month-old J.B., who died as the result of blunt force trauma to her body. Upon agreement of the parties, the trial court sentenced Appellant to 35 years' confinement.

On appeal, Appellant contends that the trial court erroneously denied his motion to suppress evidence of several recorded statements he made shortly after J.B.'s death to law enforcement officers and to a 911 operator, arguing that his statements were coerced and the result of police overreaching, and were therefore not freely and voluntarily given. Appellant contends that the trial court's alleged error in allowing these statements into evidence violated his rights under the Fourteenth Amendment of the U.S. Constitution and Articles 38.21 and 38.22 of the Texas Code of Criminal Procedure. Finding no error, we affirm the trial court's judgment.

## FACTUAL BACKGROUND

On June 28, 2012, the day that J.B. died, Appellant and his wife, Pearl Lopez were living

in their home with their two daughters, ages four and two years old. J.B. had been placed in the Lopez's home by the El Paso Center for Children on June 21, 2012, as their first foster child. On that same day, Appellant and Pearl were also providing temporary respite care for another foster child, R.R, who was 13-years old at the time. At some point that morning, Pearl's mother, Alicia, arrived at the home with three of her own foster children, a 16-year-old intellectually disabled boy, and two girls, ages 11 and 9. Alicia later left the home for approximately 15 minutes to pick up two more foster children, V.F. and J.H., whom she had agreed to watch while their foster parent went to Mexico for two days. Alicia left at an undetermined time before J.B.'s injuries were discovered, taking with her all of the foster children in her care except the 11-year-old girl.

Appellant admittedly spent most of the day alone with J.B. in the couple's master bedroom, where J.B.'s crib was located, and where the couple had created an office space in their walk-in closet. The remaining family members and foster children spent most of the day in the kitchen with Appellant's wife, preparing breakfast, and later preparing for an upcoming quinceanera. Approximately two hours before J.B.'s injuries were discovered, Appellant brought his daughters into the bedroom to either nap or watch television. Appellant acknowledged that no one else entered the bedroom that day, although he did recall hearing someone open a file cabinet in the bedroom, and assumed it was one of his children or his wife. [1]

According to Appellant, when he approached J.B.'s crib to change her diaper, he observed J.B.'s eyes crossing and rolling backwards in her head, and upon lifting her, he noted that her body was limp. Appellant then called out to his wife for help, and called 911 at approximately 3:00 p.m., advising the 911 operator that J.B. was in distress. Appellant told both the 911 operator and

---

[1] According to Appellant, his wife later informed him that she had not opened the file cabinet.

the first responders at the scene that he had been alone all day with J.B. in the bedroom but denied knowing what had happened to her. J.B. was transported to the hospital by ambulance but died shortly after her arrival at approximately 4:00 p.m.

### Appellant's First Recorded Statement

After police arrived at his home the afternoon of J.B.'s death, Appellant spoke with Detective Arturo Ruiz and agreed to travel with him to police headquarters to provide a recorded statement, which began at approximately 8:00 p.m. At the start of the recorded statement, Detective Ruiz informed Appellant that he was not under arrest and that he was free to leave at any time, but nevertheless advised Appellant of his *Miranda* rights, which Appellant expressly waived.[2]

After Appellant stated that he wanted to cooperate with Detective Ruiz, Appellant provided a description of the day's events, acknowledging that he was alone with J.B. throughout the day in the master bedroom, except for a brief period of time when he brought his two children into the bedroom. Appellant further acknowledged that he, his wife, and his mother-in-law were the only adults in the house on that day. Appellant further explained that he and his wife typically shared the responsibility of caring for J.B., who not yet walking, was overcoming an aversion to men, and preferred to be with Appellant's wife; however, Appellant acknowledged that he was J.B.'s sole caretaker that day.

Appellant recalled that when he approached J.B.'s crib to change her diaper that afternoon, he observed J.B. "wincing" or "whimpering," observed her eyes roll back in her head. and noted that her lips were "whitish." He then called out to his wife for help and called 911 immediately

---

[2] Appellant does not raise any issues regarding whether he was properly advised of his *Miranda* rights and/or whether he voluntarily waived those rights prior to giving any of his recorded statements.

thereafter. Appellant repeatedly asserted that he did not know what had caused J.B.'s distress, and that neither he, his wife, nor any of the children had hurt J.B. After providing his statement, Appellant was permitted to return home without being placed under arrest.[3]

### The Autopsy Findings

An autopsy was performed on J.B.'s body on July 31, 2012 by Dr. Juan Contin, the Deputy Medical Examiner for El Paso County. Dr. Contin concluded that J.B. had died as the result of "blunt force injuries to the chest and abdomen." He further noted that J.B. had tears in her liver, which caused excessive internal bleeding, and that she also had "contusions to the head associated with a fracture of the left occipital bond." Dr. Contin concluded that J.B.'s injuries were consistent with someone striking her with a foot, stomping on her two or three times--or perhaps as many as six or seven times--using significant force. Given the nature of J.B.'s injuries, Dr. Contin concluded that they were intentionally inflicted by someone using a significant amount of force, and that the manner of death was homicide.

### Appellant's Second Recorded Statement

After J.B.'s autopsy had been performed and the cause of her death identified, the police requested that Appellant and his wife provide additional statements to police, and Appellant and his wife thereafter voluntarily drove their own vehicle to police headquarters to provide their statements.[4] Appellant provided his second recorded statement to Detective Ruiz and Detective Jerome Hinojos at police headquarters on July 31, 2012 at approximately 7:30 p.m. Prior to

---

[3] R.R. was also interviewed that day at the Advocacy Center for the Children of El Paso, and she was similarly unable to provide any explanation for J.B.'s death.

[4] The couple also agreed to drop their two daughters off at the Child Advocacy Center on their way to police headquarters so that their daughters could be interviewed. It does not appear that the daughters were able to provide any additional information regarding the cause of J.B.'s injuries.

4

giving his statement, Detective Hinojos informed Appellant that he was not under arrest, but once again read Appellant his *Miranda* rights, and once again Appellant acknowledged that he understood his rights was willing to waive them.

Appellant initially provided the same factual scenario as he did during his first statement to police, again acknowledging that he was the only adult responsible for watching J.B. in the master bedroom throughout the day, but that he did not know what had caused J.B.'s death. The detectives then informed Appellant that J.B.'s autopsy, which they had personally observed, revealed that J.B. had died as the result of a significant blow to her stomach or abdomen, which occurred within two hours of when Appellant called 911 was made, while he and his wife had legal and physical possession of J.B. The detectives also stated that the medical examiner had concluded that J.B.'s injuries were intentional, and that given the amount of force necessary to have caused the injuries, they could only have been inflicted by an adult, and therefore, they did not suspect any of the children who were in the house on the day of J.B.'s death of causing her injuries.[5] The detectives repeatedly reminded Appellant that he had previously acknowledged that he was alone in the bedroom with J.B. throughout the day, and that he and his wife were the only two adults in the house responsible for J.B.'s care in the house that day, which Appellant freely acknowledged throughout the interview.

However, Appellant continually denied that he had any involvement in J.B.'s death and stated that he had no explanation for how J.B. was injured, other than to repeatedly say that "something went wrong that day." In response, the detectives repeatedly stated that absent any

---

[5] In addition, during his interviews with police, Appellant repeatedly stated that because of the nature of her respite stay status, R.R. was only permitted to engage with J.B. while supervised, and Appellant stated that he and his wife never left R.R. alone with J.B. The detectives therefore eliminated R.R. as a suspect on that basis as well.

5

other "reasonable explanation" for how J.B. was injured, this meant that either Appellant or his wife, or perhaps both, inflicted the injuries and were therefore responsible for J.B.'s death. Despite these statements, the detectives made it clear that their focus was on Appellant, in part because they did not believe that his wife was physically capable of inflicting the injuries on J.B., and in part because Appellant had repeatedly told them that he was the only adult taking care of J.B. on the day of her death.[6] After Appellant repeatedly claimed that he did not know what happened to J.B., the detectives then switched tactics and began asking Appellant about his religious faith and his active role in his church, which Appellant had mentioned earlier in the interview. Appellant expressed his belief that if a person who had committed a crime, such as a murder, he could only be "forgiven" and allowed to enter the "Kingdom of God," if he asked for God's forgiveness, as well as "forgiveness under man's law," meaning that the person would need to be honest about his actions.

Appellant was allowed to leave police headquarters, along with his wife, at approximately 10:08 p.m. that night without being placed under arrest. Appellant's wife testified at the suppression hearing that upon leaving police headquarters, she informed Appellant that the police had threatened to arrest her if she did not tell them what she knew about J.B's death, and that if she did not, one or both of them would be going to jail for murder, and that their children could be removed to foster care.[7] She recalled that Appellant responded by telling her that he intended to turn himself in, even though he denied being responsible for hurting J.B. [8] She testified that she

---

[6] In addition, the detectives advised Appellant that the older children who had been in the house that day of J.B.'s death had been interviewed, and that they all stated that Appellant's wife had been in a different part of the home that day.

[7] At the hearing on Appellant's motion to suppress, Detective Hinojos denied threatening Appellant's wife with arrest.

[8] Appellant's wife testified at trial that she believed Appellant was innocent and that he only confessed because he

then took Appellant to their home, and thereafter went to her parents' house for the night. Appellant's wife later called Detective Hinojosa and left a message saying that Appellant was going to turn himself in; however, she admittedly did not advise the detective that Appellant was doing so because of any threats made to her or Appellant.

## The 911 Call and the Third Recorded Statement

Early the next morning on August 1, 2011, at approximately 1:31 a.m., Appellant called 911, and after providing his name and address to the 911 operator, he stated that he was "confessing" to a homicide that had occurred at his house on July 28, and that he wanted a police officer to come pick him up. Although not certain if the call was a prank, a patrol officer arrived at Appellant's house in a marked patrol car, and Appellant stepped outside. Appellant informed the officer that he was responsible for the homicide of his 11-month-old foster child. Appellant was then transported to police headquarters, but was not handcuffed or placed under arrest at that time.

Appellant gave his third recorded statement at police headquarters that same morning, at approximately 4:00 am to Detective Hinojos. Before taking Appellant's statement, Detective Hinojos once again read Appellant's *Miranda* rights to him, and Appellant once again acknowledged that he understood his rights, and that he was knowingly, intelligently, and voluntarily waiving those rights.

Detective Hinojos began the interview by asking Appellant whether he had told the truth in earlier interviews regarding the cause of J.B.'s injuries, and in response, Appellant began a protracted and uninterrupted soliloquy in which he stated that approximately ten to fifteen minutes

---

was afraid that she would be put in jail and their children would be taken away from them.

7

before he called 911, his daughters had left the bedroom to be with his wife, and he had picked J.B. up from her crib. Appellant recalled that when J.B. began crying, he became upset because he believed J.B. did not want to be with him, and he then put J.B. down on the floor, and "stomped on her like two times, three times." At the detective's request, Appellant demonstrated how he had stomped on J.B. Appellant recalled that he then picked up J.B., who was gasping for air, and saw her eyes cross and roll back in her head, and felt her body go limp. He further recalled that when he placed J.B. back in her crib, she could not sit up; after trying to assist her by blowing into her mouth two or three times, he called his wife for help.

Appellant explained that he was confessing in part because of his religious beliefs--as discussed during the earlier interview--but also because he did not want to die on death row, and that he hoped that he would be released from prison one day to be able to see his family again. Appellant was thereafter arrested and charged with capital murder.

### The Motion to Suppress

Prior to his trial, Appellant moved to suppress he recorded statements he made to law enforcement officers on August 1, 2012, arguing that they were not freely and voluntarily made because the detectives had repeatedly threatened to arrest both him and his wife and have their children removed from them and placed in foster care if he did not confess. The trial court heard Appellant's motion to suppress over a two-day period, taking witness testimony and listening to the various recordings. The trial court denied Appellant's motion and thereafter allowed the State to admit all of Appellant's recorded statements into evidence at his trial.

After Appellant appealed his conviction, at this Court's request, the trial court entered written findings of fact and conclusions of law with regard to its decision, expressly finding that Appellant voluntarily went to police headquarters to provide all three of his statements, and that

8

he was properly read his *Miranda* rights on all three occasions, and that he freely and voluntarily waived those rights. The trial court further concluded that the detectives did not coerce and/or threaten Appellant into giving any of his statements. The trial court therefore concluded that Appellant's statements were freely and voluntarily made in compliance with Articles 38.21 and 38.22, as well with all constitutional requirements.

At trial, the jury was instructed in general terms that a defendant's confession may only be considered if it was made freely and voluntarily without compulsion or persuasion; the trial court also specifically directed the jury to disregard Appellant's recorded statements if it had a reasonable doubt regarding whether they were made as the result of a "threat that his wife would be arrested and his children would be taken from their home." Following trial, the jury found Appellant guilty of J.B.'s murder, and Appellant was sentenced to 35-years' confinement in prison.

## DISCUSSION

In two related issues, Appellant contends that the trial court erred when it denied his motion to suppress and that the trial court's error violated his rights under the Due Process Clause of the Fourteenth Amendment to the United States Constitution, and Articles 38.21 and 38.22 of the Texas Code of Criminal Procedure. Because we agree with the trial court that Appellant's statements were not coerced and were instead given freely and voluntarily and without compulsion, we conclude that the trial court did not err in denying the motion to suppress.

### *Standard of Review*

We review an appeal from a trial court's ruling on a motion to suppress for an abuse of discretion and apply a bifurcated standard of review. *State v. Luna*, 08-16-00273-CR, 2019 WL 1925004, at *4 (Tex.App.--El Paso Apr. 30, 2019, no pet.)(not designated for publication), *citing Weems v. State*, 493 S.W.3d 574, 577 (Tex.Crim.App. 2016). Under this bifurcated standard, we

9

are required to afford almost total deference to the trial court's determination of historical facts, especially when those determinations are based on assessments of witness credibility and demeanor. *Id.*, *citing Furr v. State*, 499 S.W.3d 872, 877 (Tex.Crim.App. 2016)). When, as here, a trial court makes express findings of fact, we must first determine whether the evidence, when viewed in the light most favorable to the trial court's ruling, supports those findings. *Id.*, *citing Valtierra v. State*, 310 S.W.3d 442, 447 (Tex.Crim.App. 2010). However, we conduct a *de novo* review with regard to pure questions of law, to mixed questions of law and fact that do not hinge on credibility or demeanor, and to the trial court's application of the law to the facts. *Id.*, *citing State v. Woodard*, 341 S.W.3d 404, 410 (Tex.Crim.App. 2011); *Brodnex v. State,* 485 S.W.3d 432, 436 (Tex.Crim.App. 2016).

### The Police May Make Truthful Statements to an Accused

A confession may be rendered inadmissible under both the Due Process Clause and Article 38.22 of the Code of Criminal Procedure if it was not voluntarily made. *Luna 20*19 WL 1925004, at *8, *citing Oursbourn v. State*, 259 S.W.3d 159, 169-70 (Tex.Crim.App. 2008). Under the Due Process Clause, a statement may be rendered involuntary due to police overreaching or misconduct, but only if it rises to the level at which the defendant's will was "overborne and his capacity for self-determination critically impaired." *Id., citing* ; *see also Craeger v. State*, 952 S.W. 2d 852, 856 (Tex.Crim.App. 1997)(the ultimate test in determining the voluntariness of a confession is whether the defendant's will was overborne by police coercion). Statements that have been found to be involuntary under the Due Process Clause include factual scenarios in which a suspect was subjected to threats, physical abuse, or extended periods of interrogation without rest or nourishment. *Luna,* 2019 WL 1925004 at *8, *citing Oursbourn*, 259 S.W.3d at 170-71.

Texas law generally allows for a broader inquiry when considering involuntariness issues

10

and allows a court to consider more subjective considerations that are not relevant to Due Process claims. *Luna,* 2019 WL 1925004 at *8, *citing Oursbourn*, 259 S.W.3d at 169-71. Under Article 38.21 of the Texas Code of Criminal Procedure, a statement may be used against a defendant only if it was "freely and voluntary made without compulsion or persuasion . . . ." TEX.CODE CRIM.PROC.ANN. § 38.21. In turn, section 6 of Article 38.22 provides that "where a question is raised as to the voluntariness of a statement of an accused, the court must make an independent finding in the absence of the jury as to whether the statement was made under voluntary conditions." TEX.CODE CRIM.PROC.ANN. § 38.22, § 6. If the trial court determines that a statement was made voluntarily, then the statement may be submitted to the jury, but the jury must be instructed that unless it believes beyond a reasonable doubt that the statement was "voluntarily made," it may not consider the statement for any purpose. TEX.CODE CRIM.PROC.ANN. § 38.22, § 6.

In determining the voluntariness of a confession under the Code, Texas courts employ a totality of the circumstance test, and consider all of the circumstances surrounding its acquisition. *Luna,* 2019 WL 1925004, at *9, *citing Wyatt v. State*, 23 S.W.3d 18, 23 (Tex.Crim.App. 2000); *Delao v. State*, 235 S.W.3d 235, 239 (Tex.Crim.App. 2007). In general, the State has the burden of proving the voluntariness of a confession, and it must satisfactorily negate the accused's allegations of coercion in order to satisfy its burden of proof. *Vasquez v. State,* 411 S.W.3d 918, 920, n.11 (Tex.Crim.App. 2013); *Zuliani v. State,* 903 S.W.2d 812, 821 (Tex.Crim.App. 1995).

In the present case, Appellant argues that his confession was coerced and was not freely and voluntarily given because the detectives conducting his second interview made threats to arrest his wife if he did not confess to J.B.'s murder, and further threatened that his children would be taken away from him; he characterizes these alleged threats as being "inherently coercive,"

claiming that they caused his will to be overborne. Appellant is correct that, in some instances, a threat to arrest an accused's family member--whether express or implied--may result in a confession being rendered involuntary. *Luna,* 2019 WL 1925004, at *9, *citing Roberts v. State,* 545 S.W.2d 157, 161 (Tex.Crim.App. 1977)(threat made by police officers to arrest or punish a close relative or a promise to free a relative of a prisoner in exchange for a confession may render the prisoner's subsequently made confession inadmissible in evidence); *see also Contreras*, 312 S.W.3d at 577 (threats to arrest and prosecute defendant's wife raised a fact issue regarding whether his confession involuntary).

However, a confession is not rendered inadmissible in every instance in which the police have made statements regarding the potential liability of an accused and his family members. To the contrary, as we recently recognized in *Luna*, the police are entitled to make truthful statements to an accused that accurately reflect the potential consequences that an accused and his family member are facing, such as the potential that they could be arrested and prosecuted for a crime, and the resulting prospect that they could lose custody of their children in the process. *Luna,* 2019 WL 1925004 at *10, *citing United States v. Phillips*, 230 Fed. Appx. 520, 524-25 (6th Cir. 2007)(focusing a suspect's attention on the potential legal consequences of his actions is not self-evidently coercive; indeed, it is more likely to focus the mind on the importance of answering questions accurately, voluntarily or not at all); *United States v. Gallardo-Marquez*, 253 F.3d 1121, 1123 (8th Cir. 2001)(defendant's confession was voluntary where officers' statements to the effect that he would be going to jail for life and that he should therefore cooperate with the government to reduce his jail time were "accurate representations" of the defendant's situation); *United States v. Braxton*, 112 F.3d 777, 782 (4th Cir. 1997)(recognizing that a law "enforcement officer may properly tell the truth to the accused," and that "[t]ruthful statements about [the defendant's]

12

predicament are not the type of 'coercion' that threatens to render a statement involuntary."); *Hernandez v. State,* 421 S.W.3d 712, 720 (Tex.App.--Amarillo 2014, pet. ref'd)(where interrogator made a statement regarding the potential length of a prison sentence faced by defendant, this was nothing more than "an accurate representation of [the defendant's] predicament that did not render the confession involuntary).

Thus, in *Luna*, we concluded that because the police had probable cause to arrest the appellant's wife and other family members, all of whom were involved in a brawl that led to the victim's death, they did not engage in improper overreaching when they advised the appellant that his wife could be arrested, and that if so, they could potentially lose custody of their children. *Luna,* 2019 WL 1925004, at *10, *citing Contreras*, 312 S.W.3d at 576. Instead, we concluded that the threats were instead simply truthful representations of the situation that the appellant was facing. *Id.*, *citing Hernandez v. State*, 421 S.W.3d 712, 721 (Tex.App.--Amarillo 2014, pet. ref'd)(officer's statements emphasizing to appellant that she faced separation from her children were not threats of governmental action to punish a failure to cooperate but were accurate representations of her predicament); *United States v. Santos-Garcia*, 313 F.3d 1073, 1079 (8th Cir. 2002)(confession was not involuntary where the interrogating officers told the suspect that his story did not make sense and that his children would be driving by the time he was released from prison, finding that the statement was simply an accurate representation of the defendant's predicament).

### The Nature of the Detectives' Statements

In the present case, Appellant chronicles 17 statements that he believes constituted threats to arrest his wife if he did not confess to J.B.'s murder. However, a closer review of the challenged statements reveals that the majority of the statements were nothing more than

13

descriptive, factual statements regarding the situation that Appellant and his wife were facing, i.e., that they were the only two responsible adults in a house where an 11-month old infant died as the result of multiple brunt force trauma, and that absent any other "reasonable explanation" for how the trauma was inflicted, either Appellant or his wife--or perhaps both--were responsible for the infant's death.[9] We do recognize, however, that in at least two instances, the police went a step further, and stated that unless Appellant could give a "reasonable explanation" for J.B.'s death, then both he and his wife could be arrested and face time in jail and/or prosecution. First, the detectives stated that if they had to take "this to court," one or both of them could be "locked up" while the courts decided what to do with them, and while they did not believe that his wife committed the murder, "[i]f she has to answer for it, then she's gonna [sic] have to answer for it, too." Second, the detectives expressed their belief that Appellant's wife, while not necessarily a primary suspect in the murder, could be "covering" for Appellant; they then stated that both of them could go to jail and their "kids [could] go to foster care . . . and then hopefully the[y] don't end up with a family like yours and end up on a slab where I have to go see them get cut open--- and then blood leak out of their stomachs."[10]

While these statements can be considered "threats" to arrest Appellant's wife, we conclude that the statements were supported by probable cause and that the police did not engage in any overreaching or misconduct in making the statements.[11] As explained above, Appellant admitted

---

[9] For example, during the second recorded interview, the detectives made the following statements: "[I]t's either you or your wife. . . ." "And if you didn't do it, then I guess your wife made the mistake, okay?" "But the thing is that that child suffered injuries at your hand or the hands of your wife, or both . . . ." "But I can tell you right now, okay that that child suffered those injuries under your hand--or your wife's hand. Period. Period. Okay? It's not a mysterious injury, okay?"

[10] Earlier in the interview, Detective Ruiz informed Appellant that he had observed J.B.'s autopsy and that it was "unbelievable" that he had to watch "an 11-month-old baby on [a] slab getting cut open."

[11] The test for determining whether probable cause exists is an objection one, and depends on whether the facts and

14

to the detectives that he and his wife were the only two responsible adults in the house at the time of J.B's death, and the detectives had ruled out the possibility that any of the children present in the house could have inflicted the fatal blows to J.B. Therefore, the only two suspects in the case were Appellant and his wife, and the detectives truthfully advised Appellant that they were both subject to arrest, either as primary suspects or as accomplices after the fact. *See, e.g., Diaz v. State*, No. 13-14-00675-CR, 2017 WL 4987665, at *5 (Tex.App.--Corpus Christi Nov. 2, 2017, pet. ref'd)(not designated for publication)(where police had probable cause to believe that defendant's parents were responsible for hindering the defendant's apprehension, defendant's confession was not rendered involuntary where the police advised the defendant of the possibility that his parents could be arrested).

In reaching this conclusion, we find it helpful to contrast Appellant's situation with the situation faced by the defendant in *Contreras v. State*. In *Contreras*, the defendant had been home alone with his sister-in-law's child and when the other family members returned, they found that the child was lifeless, and was later pronounced dead. *Contreras,* 312 S.W.3d. at 570. During his interrogation, the police told the defendant that if he did not confess, they could arrest his wife, as she took care of the child during the week; they further stated that if she was arrested, Child Protective Services would take away their children. *Id.* at 570. In determining whether these threats rendered the defendant's confession involuntary, the Court noted that various federal and state courts have held that "law enforcement officials can threaten to arrest a family member, without vitiating the voluntariness of a confession, if they can lawfully effectuate such an arrest

---

circumstances within an officer's knowledge and of which he had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the arrested person had committed or was committing an offense. *Luna,* 2019 WL 1925004, at *10, *citing Nelson v. State*, 848 S.W.2d 126, 133 (Tex.Crim.App. 1992); *Amador v. State,* 275 S.W.3d 872, 878 (Tex.Crim.App. 2009).

15

(i.e., if there is probable cause to arrest)." *Id.* at 577. Although the Court in *Contreras* declined to decide whether to adopt such a rule in Texas, the Court found it significant that the officers in that case did not have probable cause to arrest the defendant's wife, as she was not with the child at the time she died, thereby raising a question regarding the voluntariness of the confession on that basis.[12] *Id.* at 577; *see also Tovar v. State*, 709 S.W.2d 25, 28 (Tex.App--Corpus Christi 1986, no pet.)(finding confession was inadmissible where police threatened to arrest accused's wife for possession of marijuana where there was no evidence that the police suspected her of exercising any care, custody or control over the marijuana at the time it was discovered).

Unlike the situation in *Contreras*, Appellant's wife was in the house with Appellant at the time J.B.'s injuries were inflicted, was legally responsible for J.B.'s care, and had access to J.B. throughout the day. As such, the detectives accurately and truthfully informed Appellant that they were both suspects in J.B.'s death, and that both could be arrested, and as a corollary to this, the detectives also accurately and truthfully informed Appellant that if both he and his wife were arrested, their children could be placed in foster care.[13] While Appellant may have been motivated to confess in part by the desire to extricate his innocent wife from the prospect of being arrested for his crime, this does not in itself render his confession involuntary, and instead, at most created a jury question regarding whether his confession was voluntarily given. *See, e.g., Roberts,* 545 S.W.2d at 161 (a confession is not rendered involuntary by threats to arrest a prisoner's relative, where the "prisoner has created conditions which place an innocent relative under suspicion and

---

[12] In *Contreras*, the appellant's only complaint on appeal was that the trial court failed to instruct the jury not to consider his confession if it found that it was involuntarily given in light of the threats that were made to arrest his wife. *Contreras*, 312 S.W.3d at 570. As set forth above, the jury herein was given such an instruction, but Appellant argues that his confession should have been suppressed altogether.

[13] As well, given what occurred to J.B. in foster care, the detectives were not untruthful in raising the prospect that their own children could also be injured if placed in the wrong hands.

the prisoner desires to extricate the relative from this position by making a confession and the confession is self-motivated."). We therefore conclude that the trial court did not abuse its discretion in finding that Appellant's confession was made voluntarily and in submitting the matter to the jury for resolution. As such, we hold that the trial court did not violate either Appellant's constitutional or statutory rights when it admitted the confession at Appellant's trial.[14]

### *Harmless Error Analysis*

And finally, we agree with the State that even if the trial court erred in admitting Appellant's recorded statements into evidence, the admission of the statements was not reversible error. *See, e.g., Zuliani v. State,* 903 S.W.2d 812, 823 (Tex.App.--Austin 1995, pet. ref'd), *citing Arizona v. Fulminante,* 499 U.S. 279, 310 (1991)(recognizing that the admission of a coerced conviction is considered trial error and is subject to a harmless error analysis). As the State points out, at trial, the jury received evidence, without any objection from Appellant, of a separate confession that Appellant made on August 2, 2012--the day after his confession to Detective Hinojos---to an investigator from the Texas Department of Family and Protective Services, who had been assigned to conduct a non-criminal investigation into J.B.'s death. Specifically, the investigator testified at trial that Appellant confessed to him that he had picked J.B. out of her crib, laid her face up, and then stomped on her twice. As the jury received evidence of Appellant's

---

[14] The State also argues that there was no causal connection between the alleged threats made by the detectives and the defendant's confession, given the lapse in time that occurred between the threats and Appellant's confession. The State is correct that in some instances, when a defendant when there is a significant break between the time the police threaten the defendant and the time the defendant confesses, this may break any causal connection between the threats and the confession, thereby rendering the confession admissible at trial, *See, e.g., Zuliani v. State*, 903 S.W.2d 812, 822 (Tex.App.--Austin 1995, pet. ref'd)("An interruption in the stream of events between the initial coercion and the confession has been recognized as significant" in determining the voluntariness of a confession). Appellant counters that the causal connection was not broken, as the evidence demonstrated that he announced his decision to his wife that he intended to confess to police immediately after leaving police headquarters on their drive home. Given our conclusion that Appellant's confession was not the result of police overreaching or misconduct, and that it was instead freely and voluntarily made, we need to address the State's argument on this point.

August 2nd confession without objection from Appellant, we conclude that any error in admitting his August 1st confession was thereby rendered harmless. *See generall*y *Leday v. State*, 983 S.W.2d 713, 717-18 (Tex.Crim.App. 1998), *citing Crocker v. State,* 573 S.W.2d 190, 201 (Tex.Cr.App.1978)("It is well established that the improper admission of evidence does not constitute reversible error if the same facts are shown by other evidence which is not challenged."); *see generally Lane v. State*, 151 S.W.3d 188, 193 (Tex.Crim.App. 2004)("An error [if any] in the admission of evidence is cured where the same evidence comes in elsewhere without objection.").

Appellant's issues one and two are overruled.

## CONCLUSION

The trial court's judgment is affirmed.


August 14, 2019

ANN CRAWFORD McCLURE, Chief Justice

Before McClure, C.J., Rodriguez, and Palafox, JJ.

(Do Not Publish)